Frank J. KELLEY, Attorney General of the State of Michigan, Frank J. Kelley, ex rel. State of Michigan, Michigan Department of Natural Resources, Frank J. Kelley, Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, William K. Reilly, Administrator, Respondents,

American Bankers Association, Equipment Leasing Association of America, Commercial Finance Association, American Council of Life Insurance, American College of Real Estate Lawyers, Intervenors.

CHEMICAL MANUFACTURERS ASSOCIATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent,

American Bankers Association, Equipment Leasing Association of America, Commercial Finance Association, American Council of Life Insurance, American College of Real Estate Lawyers, Intervenors.

Nos. 92–1312, 92–1314.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 28, 1993.

Decided Feb. 4, 1994.

Dissenting Opinion of Chief Judge Mikva March 1, 1994.

Jeremy M. Firestone, Asst. Atty. Gen., State of Mich., argued the cause, for petitioners Mich. Atty. Gen. Frank J. Kelley, the State of Mich. and the Mich. Dept. of Natural Resources in No. 92–1312. With him on the briefs was Thomas L. Casey, Sol. Gen., State of Mich.

Theodore L. Garrett argued the cause, for petitioner Chemical Mfrs. Ass'n in No. 92–1314. With him on the briefs were David F. Zoll and Dell E. Perelman.

Bradley M. Campbell, Atty., U.S. Dept. of Justice, argued the cause, for respondents. With him on the brief was Earl C. Salo, Counsel, U.S. E.P.A. Michael A. McCord, Atty., U.S. Dept. of Justice, entered an appearance, for respondents.

On the joint brief, for intervenors American Bankers Ass'n, et al., and amicus curiae Mortg. Bankers Ass'n of America were John J. Gill, Thomas J. Greco, Michael F. Crotty, Roger D. Schwenke, Margaret V. Hathaway, Howard L. Feinstein, Robert S. McConnaughey, Samuel I. Gutter, David T. Buente, Jr., Edwin E. Huddleson, III, and William E. Cumberland. Richard R. Goldberg entered an appearance, for intervenor American College of Real Estate Lawyers in Nos. 92–1312 and 92–1314.

Before MIKVA, Chief Judge, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Chief Judge MIKVA.

SILBERMAN, Circuit Judge:

Petitioners challenge an EPA regulation limiting lender liability under CERCLA. We hold that EPA lacks statutory authority to restrict by regulation private rights of action arising under the statute and therefore grant the petition for review.

## I.

 Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, in 1980 to "provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." Pub.L. No. 96–510, 94 Stat. 2767 (1980). The statute provides several mechanisms to further these objectives. Section 105 requires the President to promulgate and publish a National Contingency Plan (NCP) to direct actions in response to a hazardous contamination and to prescribe the procedures for those actions. 42 U.S.C. § 9605 (1988). The President in turn has delegated primary authority under section 105—and much of CERCLA—to EPA. *See* Exec. Order No. 12,580 § 1(b)(1), *reprinted in* 42 U.S.C.A. § 9615 note at 291–95 (1993 West Supp.). Under section 104, 42 U.S.C. § 9604(a)(1), the President (again, EPA by delegation, *see* Exec. Order No. 12,580 § 2(g)) may undertake direct remedial actions—either by employing agency personnel or through private contracting—to clean up a contaminated site and may fund the cost of such actions through the Hazardous Waste Superfund, 26 U.S.C. § 9507 (1988). The government may then bring cost recovery actions under section 107 of CERCLA against responsible parties to replenish the funds expended. 42 U.S.C. § 9607(a)(4)(A).

 Alternatively, where "there may be an imminent and substantial endangerment to the public health or welfare or the environment," EPA may order parties to clean up the hazardous waste and remedy its effects. 42 U.S.C. § 9606(a); Exec.Order No. 12,580 § 4(d)(1). Those who receive and comply with such orders are entitled to reimbursement of their reasonable costs if they are not liable under section 107, 42 U.S.C. § 9607(a), or—even if liable—if they establish on the administrative record that the cleanup action ordered was arbitrary and capricious or otherwise unlawful. 42 U.S.C. § 9606(b)(2)(C)–(D). EPA also may assess civil penalties for noncompliance with certain CERCLA provisions and bring an action in federal district court to collect such penalties. 42 U.S.C. § 9609; Exec.Order No. 12,580 § 4(d)(2).

 CERCLA also authorizes private parties and EPA to bring civil actions independently to recover their costs associated with the cleanup of hazardous wastes from those responsible for the contamination. 42 U.S.C. § 9607(a). Section 107 of CERCLA generally imposes strict liability on, among others, all prior and present "owners and operators" of hazardous waste sites. *Id.* § 9607(a)(1). Congress created a safe harbor provision for secured creditors, however, in the definition of "owner or operator," providing that "[s]uch term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A).

Conflicting judicial interpretations as to the scope of this secured creditor exemption opened the possibility that lenders would be held liable for the cost of cleaning up contaminated property that they hold merely as collateral. Lenders lacked clear guidance as to the extent to which they could involve themselves in the affairs of a facility without incurring liability and also as to whether they would forfeit the exemption by exercising their right of foreclosure, which could be thought to convert their "indicia of ownership"—the security interest—into actual ownership. *See United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578–80 (D.Md.1986). In *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991), the court, although adhering to the settled view that Congress intended to protect the commercial practices of secured creditors "in their normal course of business," *id.* at 1556, nevertheless stated

that "a secured creditor will be liable if its involvement with the management of the facility is *sufficiently broad* to support the inference that it could affect hazardous waste disposal decisions if it so chose." *Id.* at 1558 (emphasis added).

This language, portending as it did an expansion in the scope of secured creditor liability, caused considerable discomfort in financial circles. Intervenor American Bankers Association points to survey data indicating that lenders curtailed loans made to certain classes of borrowers or secured by some types of properties in order to avoid the virtually unlimited liability risk associated with collateral property that may be contaminated. Some lenders, we are told, even chose to abandon collateral properties rather than foreclosing on them for fear of post-foreclosure liability.

EPA, responding to the understandable clamor from the banking community and in light of the federal government's increasing role as a secured creditor after taking over failed savings and loans,[1] instituted a rulemaking proceeding, 56 Fed.Reg. 28,798 (1991), to define the secured creditor exemption when legislative efforts to amend CERCLA failed. *See, e.g.,* H.R. 4494, 101st Cong., 2d Sess. (1990), 136 Cong.Rec. H1505 (daily ed. Apr. 4, 1990). In April 1992, EPA issued the final regulation, which employs a framework of specific tests to provide clearer articulation of a lender's scope of liability under CERCLA. The rule provides an overall standard for judging when a lender's "[p]articipation in [m]anagement" causes the lender to forfeit its exemption. 40 C.F.R. § 300.1100(c)(1) (1992). A lender may, without incurring liability, undertake investigatory actions before the creation of a security interest, monitor or inspect the facility, and require that the borrower comply with all environmental standards. 40 C.F.R. § 300.-1100(c)(2). When a loan nears default, the rule permits the lender to engage in workout negotiations and activities, including ensuring that the collateral facility does not

violate environmental laws. 40 C.F.R. § 300.1100(c)(2)(ii)(B). The rule also protects a secured creditor that acquires full title to the collateral property through foreclosure, as long as the creditor did not participate in the facility's management prior to foreclosure and undertakes certain diligent efforts to divest itself of the property. 40 C.F.R. § 300.1100(d). Lenders still face liability under section 107(a)(3) and (4)—as opposed to liability as an "owner and operator" under section 107(a)(1) and (2)—if they arrange for the disposal of hazardous substances at a facility or accept hazardous waste for transportation and disposal. 40 C.F.R. § 300.1100(d)(3).

In response to comments questioning whether the rule would apply in actions where the United States was not a party, EPA stated that the regulation is "a 'legislative' or 'substantive' rule that has undergone notice-and-comment pursuant to the Administrative Procedure Act" and as such "defines the liability of holders [of security interests] for CERCLA response costs in both the United States' and private party litigation." 57 Fed.Reg. 18,344, 18,368 (1992). The agency alternatively asserted that even if the rule were read as "a 'mere' interpretation of section 101(20)(A)," it would affect third-party litigation since "EPA guidance and interpretations of laws administered by the Agency are given substantial deference by the courts." *Id.* (citations omitted).

Michigan and the Chemical Manufacturers Association filed petitions for review of the final regulation under section 113(a) of CERCLA, 42 U.S.C. § 9613(a), which gives us exclusive jurisdiction to review any regulation promulgated under the statute. Petitioners are interested in the EPA rule because, as potential litigants under section 107, they do not want to be foreclosed from suing lenders. Petitioners argue that EPA lacks statutory authority to define, through its regulation, the scope of lender liability under section 107—an issue that they assert

---

1. Federal bank regulatory agencies might themselves be considered "owners and operators" of collateral property held by failed thrifts after their appointment as receivers or conservators of the thrifts, *see* 12 U.S.C. § 1821(d)(2)(A)–(B),

thus leading to EPA's concern that the federal government may be potentially liable. *See* 56 Fed.Reg. 28,798, 28,799 (1991); 57 Fed.Reg. 18,-344, 18,345 (1992).

only federal courts may adjudicate. They also urge that the substance of the regulation contradicts the plain meaning of certain statutory language.

## II.

Although petitioners bring a general challenge to the authority of EPA to promulgate *any* substantive regulations under CERCLA, that issue is settled. We held in *Wagner Seed Co., Inc. v. Bush,* 946 F.2d 918, 920 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), that the President had broadly delegated his statutory powers to EPA, and it is "the administering agency" for the statute. However, we had previously recognized that with respect to any specific regulation, EPA must demonstrate "either explicit or implicit evidence of congressional intent to delegate interpretive authority." *Linemaster Switch Corp. v. EPA,* 938 F.2d 1299, 1303 (D.C.Cir.1991). EPA, for its part, contends that *Wagner Seed* went further and recognized EPA's general authority under section 115 of CERCLA[2] to promulgate rules that a typical administrative agency would issue, rules that are "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (quotations omitted).

The government overreads *Wagner Seed.* We held there that EPA had authority to interpret *certain* language in section 106 of CERCLA that applied to EPA's administrative responsibilities. We rejected petitioners' argument, which found some support in a strong dissent, that the *entire* section 106 referring to liability questions must be interpreted in court, and that EPA therefore had no authority to define that section. To permit EPA to do so, petitioners had contended, would be inconsistent with the Supreme Court's decision in *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 108

L.Ed.2d 585 (1990), holding that an agency may not issue regulations covering " 'an area in which it has no jurisdiction.' " *Id.* at 650, 110 S.Ct. at 1391 (citations omitted). We emphasized, however, that the language EPA interpreted did *not* bear directly on liability issues and, indeed, suggested that since Congress provided for *de novo* judicial review of the agency's "particularized decision respecting liability," deference as to those issues would be inappropriate. *Wagner Seed,* 946 F.2d at 922. Had EPA attempted to define the manner in which a party sought judicial redress, "the rationale of *Adams Fruit* would seem to apply." *Id.* at 923. Here we encounter an issue not squarely decided in *Wagner Seed*—whether the EPA can, by regulation, define and limit a party's liability under section 107. But the reasoning of *Wagner Seed,* or at least its dicta, cuts against the government.

EPA looks to several different portions of CERCLA to find the specific authority we have required. The agency points to section 105 of CERCLA, which provides that the agency has responsibility to promulgate the national contingency plan setting forth the actions and procedures to be taken in response to a contamination. It is argued that the broad language of section 105, authorizing EPA "to reflect and effectuate the responsibilities and powers created by this chapter," 42 U.S.C. § 9605(a); Exec.Order No. 12,580 § 1(b)(1), gives it power to define section 107 liability—which the agency characterizes as a "responsibility and power" under the chapter. Although the mandate of section 105 does "provide[ ] the EPA with broad rulemaking authority to craft the NCP," *Ohio v. EPA,* 838 F.2d 1325, 1331 (D.C.Cir.1988), it is hardly a specific delegation of authority to EPA to interpret section 107. We must still determine whether defining the scope of liability is among the "responsibilities and powers" Congress delegated to EPA under CERCLA.[3]

---

2. That section states:
 The President is authorized to delegate and assign any duties or powers imposed upon or assigned to him and to promulgate any regulations necessary to carry out the provisions of this subchapter.
 42 U.S.C. § 9615.

3. Section 107 does implicate EPA's role in promulgating the NCP under section 105 because response costs are recoverable only to the extent that they are "consistent with the national contingency plan," 42 U.S.C. § 9607(a)(4)(B). That provision, however, speaks not to the question of liability but instead to the remedy against a party

EPA points to specific provisions of that section, paragraphs 105(a)(4) and 105(a)(3). The former authorizes the agency to prescribe "appropriate *roles* and responsibilities . . . of nongovernmental entities in effectuating the plan." 42 U.S.C. § 9605(a)(4) (emphasis added). EPA claims that the lender liability rule accomplishes just that by defining the "role" of security creditors. That is an imaginative use of the word role, but EPA's argument is hardly persuasive since section 105 refers to the nature of actions parties must take in response to contamination—not their ultimate liability for the contamination set forth in section 107. If EPA's position were correct, Congress would have had no need to provide for a party's liability in section 107; EPA would have been authorized to develop those standards under section 105. For similar reasons, paragraph 105(a)(3) does not help EPA. That provision obliges the agency to issue "methods and criteria for determining the appropriate extent of removal, remedy, and other measures authorized by [CERCLA]," but it does not speak to liability. As discussed below, a party might be obliged to provide a remedy and be entitled to reimbursement when determined subsequently not to be liable.

■■■ EPA also relies on those statutory provisions which grant it authority to seek enforcement. The agency may choose to contract to clean up a contaminated site (financed through the Superfund), and then bring action in federal court under section 107(a)(4)(A) to recover its costs from a liable party. It is argued that the agency must first decide whether a party is actually liable before bringing such an action. That is no different, however, than any government "prosecutor" who must in good faith determine for itself whether a civil action in federal court should be brought—which necessarily includes a judgment whether a potential defendant violated the law or is "liable." The court is, nevertheless, the first body to

formally determine liability, and therefore a civil prosecutor typically lacks authority to issue substantive regulations to interpret a statute establishing liability. *See, e.g., EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 256, 111 S.Ct. 1227, 1235, 113 L.Ed.2d 274 (1991); *Skidmore v. Swift & Co.,* 323 U.S. 134, 137–38, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944).

■■■ To be sure, the agency also has authority, when imminent danger of harm exists, to issue administrative orders under section 106(a) requiring private parties to clean up a site. And, if the party refuses, section 106(b)(1) authorizes EPA to seek compliance in federal court. But, under the statute, a respondent must comply with such orders whether or not it is liable. Liability issues are resolved when the party against whom the order was levied seeks reimbursement under section 106(b)(2). The statutory scheme might be described as requiring parties to shoot first (clean up) and ask questions (determine who bears the ultimate liability) later.

■■■ That brings us to EPA's strongest argument—that its role in implementing the reimbursement provisions of section 106(b)(2) implies authority to define liability. Under that section, a party that has cleaned up a contaminated site pursuant to an administrative order may petition the EPA for reimbursement of its reasonable costs. If EPA refuses, a federal court may order reimbursement if it determines that the party is not liable or, even if liable, that the party has demonstrated that the cleanup actions it was ordered to take were arbitrary and capricious or otherwise unlawful. 42 U.S.C. § 9606(b)(2)(C)–(D). By implication, EPA argues that it must decide these liability questions when it determines whether or not to reimburse.

A careful reading of that provision, and the entire subsection 106(b),[4] leads us to a con-

---

already deemed to be liable. EPA's role in defining the parameters of the NCP, therefore, does not translate to authority to determine liability under section 107, but rather to limit the level of damages recoverable by the prevailing party.

**4.** Section 106(b) provides in relevant part:

(2)(A) Any person who receives and complies with the terms of any order issued under subsection (a) of this section may, within 60 days after completion of the required action, petition the President for reimbursement from the Fund for the reasonable costs of such action, plus interest. . . .

trary view. Although a party must first petition EPA for reimbursement under subparagraph 106(b)(2)(A), that provision is completely silent as to what criteria EPA uses to grant reimbursement.[5] If EPA denies reimbursement because the agency contends the party is liable, the party has a right to bring an action in federal court under subparagraph 106(b)(2)(B); if the party establishes that it is not liable by a *preponderance of the evidence,* under subparagraph 106(b)(2)(C) it prevails. EPA is, under that scenario, only a defendant; its preliminary conclusion that the party was liable is entitled to no consideration, let alone the deference afforded to the typical administrative agency adjudication. On the other hand, a petitioner who *is* liable may nevertheless seek review under subparagraph 106(b)(2)(D) to challenge the reasonableness of EPA's ordered response. In such a case, the party, "a petitioner," must establish *on the administrative record* that EPA's order was arbitrary and capricious or not in accordance with law, the familiar APA standard of review.

■ The drafters of subsection 106(b) appear to us to have quite consciously distinguished between EPA's role in determining the appropriate cleanup action (which is entitled to deference under 106(b)(2)(D)) from the agency's position on liability when a party disputes claims. Liability issues are to be decided by the court, and therefore although EPA may well enjoy authority to issue regulations interpreting or implementing subparagraph 106(b)(2)(D), it does not seem that Congress intended the same authority with respect to subparagraphs 106(b)(2)(B) and (C).

That reading of section 106(b)(2) conforms with the provisions of CERCLA that provide for a private right of action in federal court by property owners or states to recover cleanup costs, *see* 42 U.S.C. §§ 9607(a)(1–4), 9613(b), 9613(f); *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1357 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991), from those liable for the contamination. Questions of liability, accordingly, can be put at issue in federal court by disputing private parties— without any government involvement. Under these circumstances, it cannot be argued that Congress intended EPA, one of many potential plaintiffs, to have authority to, by regulation, define liability for a class of potential defendants.[6] Indeed, it was that very factor that led the Court in *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 650, 110 S.Ct. 1384, 1391, 108 L.Ed.2d 585 (1990), to reject the Department of Labor's regulation as unauthorized. The Court said: "Congress has expressly established the Judiciary and not the Department of Labor as the adjudicator of *private rights of action* arising under the statute." *Id.* at 649, 110 S.Ct. at 1390 (emphasis added). Just so here. Congress, by providing for private rights of action under section 107, has designated the courts and not EPA as the adjudicator of the scope of

---

(B) If the President refuses to grant all or part of a petition made under this paragraph, the petitioner may within 30 days of receipt of such refusal file an action against the President in the appropriate United States district court seeking reimbursement from the Fund.

(C) Except as provided in subparagraph (D), to obtain reimbursement, the petitioner shall establish by a preponderance of the evidence that it is not liable for response costs under section 9607(a) of this title and that costs for which it seeks reimbursement are reasonable in light of the action required by the order.

(D) A petitioner who is liable for response costs under section 9607(a) of this title may also recover its reasonable costs of response to the extent that it can demonstrate, on the administrative record, that the President's decision in selecting the response action ordered was arbitrary and capricious or was otherwise not in accordance with law....

42 U.S.C. § 9606(b).

**5.** In fact, EPA may even reimburse a party who may be liable, since under section 122(a), EPA may enter into an agreement with any party to cleanup a hazardous waste site (including the owner or operator of the site) and under section 122(b) agree in advance to reimburse that party for its costs. 42 U.S.C. §§ 9622(a), (b)(1).

**6.** When EPA grants reimbursement under section 106(a) because it believes that a claimant is *not* liable it does, as the government points out, make a determination as to liability, but that determination does not bind—indeed it has no effect on—a district court in an action brought against the claimant by a third party under section 107. And, after all, EPA can reimburse a party based on reasons other than non-liability. *See* 42 U.S.C. §§ 9606(b)(2)(A), 9622(b)(1).

CERCLA liability.[7] And Congress did so quite deliberately. *See* 126 Cong.Rec. 30,932 (1980) (statement of Sen. Randolph) ("It is intended that issues of liability not resolved by this act, if any, shall be governed by traditional and evolving principles of common law.").

### III.

There remains the question of whether the regulation can be sustained as an interpretative rule. The preamble to the final regulation suggests that EPA attempted to straddle two horses—issuing the rule as a legislative regulation but asserting in the alternative that as an interpretative rule, it would still be entitled to judicial deference and therefore affect private party litigation. 57 Fed.Reg. 18,344, 18,368 (1992). Although we have admitted that the distinction between legislative and interpretative rules is "enshrouded in considerable smog," *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc) (quotations omitted), it is commonly understood that a rule is legislative if it is "based on an agency's power to exercise *its judgment* as to how best to implement a general statutory mandate," *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110 (D.C.Cir.1993) (quotations omitted) (emphasis added), and has the binding force of law. *Id.* at 1109. By contrast, an interpretative rule "is based on specific statutory provisions," *United Technologies Corp. v. EPA*, 821 F.2d 714, 719 (D.C.Cir.1987), and represents the agency's construction of the statute that is—while not binding—entitled to substantial judicial deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

The rule bears little resemblance to what we have traditionally found to be an interpretative regulation. EPA does not really define specific statutory terms, but rather takes off from those terms and devises a comprehensive regulatory regimen to address the liability problems facing secured creditors. This extensive quasi-legislative effort to implement the statute does not strike us as merely a construction of statutory phrases, as was so in *Wagner Seed*. *See National Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C.Cir.1992); *Chamber of Commerce v. OSHA*, 636 F.2d 464, 469 (D.C.Cir.1980).

In any event, the same reason that prevents the agency from issuing the rule as a substantive regulation precludes judicial deference to EPA's offered "interpretation." If Congress meant the judiciary, not EPA, to determine liability issues—and we believe Congress did—EPA's view of statutory liability may not be given deference. "A precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990). *Chevron*, which sets forth the reigning rationale for judicial deference to agency interpretation of statutes, is premised on the notion that Congress implicitly delegated to the agency the authority to reconcile reasonably statutory ambiguities or to fill reasonably statutory interstices. Where Congress does not give an agency authority to determine (usually formally) the interpretation of a statute in the first instance and instead gives the agency authority only to bring the question to a federal court as the "prosecutor," deference to the agency's interpretation is inappropriate. *See United States v. Western Elec. Co.*, 900 F.2d 283, 297 (D.C.Cir.1990). As we have explained, that is all that EPA can do regarding liability issues. Moreover, even if an agency enjoys authority to determine such a legal issue administratively, deference is withheld if a private party can bring the issue independently to federal court under a private right of action. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, ——, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991) (citing *Local Union 1395, International Brotherhood of Elec. Workers v. NLRB*, 797

---

7. Likewise, subparagraph (b)(2)(A)'s "receives and complies" provision at issue in *Wagner Seed* has relevance only to the party seeking reimbursement and the government and, therefore, does not impinge upon a third party's private right of action under section 107. *See Wagner Seed*, 946 F.2d at 923.

F.2d 1027, 1030–31 (D.C.Cir.1986)) (NLRB's interpretation of a collective bargaining agreement not entitled to deference since private parties can come to federal court independently to enforce those agreements). Petitioners are such private parties; they wish to preserve the right to sue lenders when, in petitioners' view, a lender's behavior transgresses the statutory test—whether or not EPA would regard the lender as liable. As we read the statute, Congress intended that petitioners' claim in such an event should be evaluated by the federal courts independent of EPA's institutional view.[8]

 Petitioners conceded that the regulation could be sustained as a policy statement that would guide EPA's enforcement proceedings across the country, but EPA has not asked that its regulation be so regarded. Furthermore, intervenors point out that if the regulation were to affect only EPA's enforcement proceedings, lenders would still face potentially staggering liability because of the generality of the statutory language and the prospect of private suits. That potential liability would force lenders to behave cautiously even if EPA were to adhere to the regulation as its policy. Given our uncertainty as to EPA's wishes, we think the proper course is to vacate the rule and leave EPA free to take whatever steps it thinks appropriate.

*　　*　　*　　*　　*　　*

We well recognize the difficulties that lenders face in the absence of the clarity EPA's regulation would have provided. Before turning to this rulemaking, EPA sought congressional relief and was rebuffed. We see no alternative but that EPA try again. The petition for review is granted and the regulation is hereby vacated.

*So Ordered.*

MIKVA, Chief Judge, dissenting:

The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, subjects four classes of parties to potential liability for hazardous waste cleanup costs: (1) the

current owner and operator of a facility where hazardous substances are located; (2) any person who owned or operated the facility at the time of disposal of hazardous substances; (3) any person who arranged for the disposal of hazardous substances; and (4) any person who accepted hazardous substances for transport to a treatment facility or disposal site. 42 U.S.C. § 9607(a). Under CERCLA, the term "owner or operator" includes any person "owning or operating" a site of environmental contamination but "does not include a person who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). This exception, known as the secured lender exemption, lies at the heart of this appeal.

In 1991, the EPA commenced a rulemaking to "specify the range of activities that may be undertaken" by secured lenders without incurring CERCLA liability. 56 Fed. Reg. 28,798, 28,799 (June 24, 1991). In 1992, the EPA adopted its Final Rule on Lender Liability Under CERCLA which provided that: (1) prior to foreclosure, a lender is subject to CERCLA liability only if she actually exercises decisionmaking control over the borrower's environmental compliance, or over all or substantially all of the operational aspects of the enterprise, 40 C.F.R. § 300.-1100(c)(1) (1992); and (2) after foreclosing, a lender remains exempt from CERCLA liability so long as she takes steps to divest herself of the property in a prompt and commercially reasonable manner, 40 C.F.R. § 300.-1100(d)(1) (1992). The EPA intended that these regulations would bind all parties in CERCLA litigation, regardless of whether the United States was a party to the suit. 57 Fed.Reg. 18,344, 18,363 (April 29, 1992).

Michigan and the Chemical Manufacturers Association filed petitions for review of the EPA Final Rule because, as potential litigants, they did not want to be foreclosed from recovering cleanup costs from those secured lenders that the Final Rule exempts from CERCLA liability. Petitioners argue, and the majority agrees, that the Final Rule

---

8. EPA may well be brought into such an action as a third party and, of course, its litigator's view

would be entitled to the same respect that a court would give any litigant. That is not "deference."

is invalid because Congress delegated to the courts, rather than to the Executive branch, authority to interpret the scope of CERCLA's secured lender exemption. I disagree. CERCLA's language, structure and legislative history suggest that Congress implicitly delegated to the President (who in turn delegated to the EPA) the authority to interpret who falls within the scope of CERCLA's regulatory regime. Accordingly, the EPA's Final Rule on Lender Liability Under CERCLA is entitled to *Chevron* deference from this court. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I would uphold the rule.

### A. Delegation of Authority

When Congress enacted CERCLA in 1980, it implicitly delegated authority to the EPA to define which parties fell within the statute's regulatory regime. For example, CERCLA charged the EPA Administrator with responsibility for prescribing the manner and form by which owners and operators were to notify the agency of hazardous waste storage, treatment or disposal at their facilities. 42 U.S.C. § 9603(c). CERCLA also authorized the EPA Administrator to promulgate rules and regulations specifying the recordkeeping requirements to which owners and operators of hazardous waste facilities were subject and vested the EPA Administrator with discretion to waive those requirements on petition from those parties. 42 U.S.C. § 9603(d). In addition, CERCLA authorized the President, who in turn authorized the EPA, to undertake those remedial actions necessary to contain or remove hazardous substances at-risk of release "unless the President determine[d] that such removal and remedial action w[ould] be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanate[d]." 42 U.S.C. § 9604(a)(1). CERCLA also authorized the EPA to issue abatement orders to those parties responsible for particularly dangerous hazardous wastes. 42 U.S.C. § 9606. To administer each of these subsections effectively, the EPA was obliged to construe the term "owner or operator" within the meaning of CERCLA; Congress implicitly delegated au-

thority to the EPA, as the administering agency, to do so. *See Wagner Seed Co., Inc. v. Bush*, 946 F.2d 918, 923 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992). Consequently, the EPA's construction of "owner or operator" is entitled to *Chevron* deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The overall structure of CERCLA's statutory scheme suggests that Congress delegated authority to the Executive to construe the scope of CERCLA's statutory coverage. In CERCLA § 101, Congress defined key statutory terms. Typically, statutes contain these definitional sections to frame an agency's delegated authority to interpret ambiguous statutory language. It would be unusual if not anomalous for Congress to have included, and left undifferentiated among CERCLA's statutory definitions, the term "owner or operator" had Congress not intended to delegate authority to the EPA to interpret this concededly ambiguous statutory term. In interpreting the statute otherwise, the majority renders the EPA powerless to define not only the term "owner or operator" within the meaning of CERCLA, but "vessel," "facility," "transport" and "transportation" as well. Interpreting CERCLA in this manner generates serious confusion within the statute's "comprehensive" regulatory regime.

The majority arrives at its statutory interpretation by passing over much of CERCLA's language, structure and legislative history and concentrating instead on the preponderance-of-the-evidence standard embodied in CERCLA § 106(b)(2)(C). This standard of review signals to the majority that Congress intended to reserve all determinations of CERCLA liability, including the scope of statutory coverage, for the courts. In my view, the majority misreads the statute and misinterprets congressional intent. The preponderance-of-the-evidence standard embodied in CERCLA § 106(b)(2)(C) simply reflects continued congressional intent to have common law principles govern determinations of proximate causation regarding hazardous waste contaminations.

Congress amended CERCLA in 1986 to provide, *inter alia,* a reimbursement mechanism for certain parties that receive and comply with EPA abatement orders. Pursuant to CERCLA § 106(b)(2)(C), a party is entitled to reimbursement of its abatement costs if it can establish "by a preponderance of the evidence that it is not liable for response costs under 9607(a)." 42 U.S.C. § 9606(b)(2)(C). Significantly, the legislative history of the 1986 amendments is devoid of any reference to, much less debate regarding, rescinding authority from the EPA to interpret who falls within the scope of CERCLA's statutory coverage. That is because § 106(b)(2)(C) does not and was not intended to strip the EPA of this authority. The preponderance-of-the-evidence standard employed in § 106(b)(2)(C) simply restates the preponderance standard already employed in § 107(b).

CERCLA § 107, entitled "Liability," provides in subsection (a) that "the owner and operator of a vessel or facility" as well as other specified parties "shall be liable" for response costs. Subsection (b), entitled "Defenses," provides that:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a *preponderance of the evidence* that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of third party other than an employee or agent of the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned ... and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607 (emphasis added). Thus, when it enacted CERCLA in 1980, Congress did not subject the EPA's interpretation of "owner or operator," or other key statutory terms which define the scope of CERCLA's coverage, to the preponderance-of-the-evi-dence standard. Congress deliberately structured § 107 so that only issues of *causation* were subject to this standard of review. Indeed, the legislative history of CERCLA § 107 indicates that Congress adopted the preponderance-of-the-evidence standard in subsection (b) to ensure that "the usual common law principles of causation, including those of proximate causation, [w]ould govern the determination of whether a defendant 'caused or contributed' to a release or threatened release." H.R.Rep. No. 96–1016, 96th Cong., 2nd Sess., pt. 2 at 33 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6136.

On this reading of the statute, a party that receives and complies with an EPA abatement order is entitled to reimbursement of costs incurred if it can prove by a preponderance of the evidence, as required by § 107(b), that it did not proximately cause the contamination. In § 106(b)(2)(B), Congress afforded EPA the first crack at making these particularized determinations of causality. However, Congress wanted "traditional rules of foreseeability, causation, and certainty" ultimately to govern determinations of CERCLA liability. H.R.Rep. No. 99–253(I), 99th Cong., 2nd Sess. at 83 (1986) *reprinted in* 1986 U.S.C.C.A.N. 2835, 2865. Accordingly, Congress incorporated into CERCLA § 106(b)(2)(C) the preponderance standard set forth in § 107(b). In so doing Congress changed little. Under CERCLA § 106(b)(2)(C), as in the rest of the statute, determinations of causality rest ultimately with the courts while most other determinations, including who falls within the scope of CERCLA's statutory coverage, are for the EPA and are entitled to *Chevron* deference.

**B. Private Right of Action**

The majority bolsters its interpretation of CERCLA § 106 by reference to the private right of action that CERCLA confers on third parties. According to the majority, "[i]t cannot be argued that Congress intended EPA, one of many potential plaintiffs, to have authority to, by regulation, define liability for a class of potential defendants." *Kelley v. E.P.A.,* 15 F.3d 1100, 1107 (D.C.Cir. 1994). The majority offers no explanation of why that argument would be untenable.

# 1112

There is every reason to hold that Congress created the private right of action to facilitate enforcement of CERCLA's statutory scheme within the parameters of lender liability which the EPA, as the administering agency, would define.

According to the majority, *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) renders implausible the interpretation of CERCLA § 106(b)(2)(C) offered above. It reads *Adams Fruit* to hold that the mere presence of a private right of action reflects a congressional intent to assign to the judiciary, rather than to the administrative agency, exclusive authority to define the scope of statutory liability. I disagree.

At issue in *Adams Fruit*, was whether Congress had delegated to the Department of Labor the authority to interpret the preemptive scope of the private right of action created by the Agricultural Workers Protection Act. Because the Department of Labor, ("DOL"), which was responsible for administering the Act, was not charged in any respect with administering the statute's private right of action, the Court held that no deference was due DOL regulations defining the interplay between those actions and the exclusivity provisions of the state worker compensation schemes. In promulgating such regulations, DOL had simply "bootstrap[ped] itself into an area in which it ha[d] no jurisdiction." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650, 110 S.Ct. 1384, 1391, 108 L.Ed.2d 585 (1990). By contrast, the EPA must interpret the scope of CERCLA's lender liability provisions "in the first instance" in order to fulfill its administrative responsibilities under CERCLA §§ 103, 104, and 106. Thus, unlike DOL in *Adams Fruit*, the EPA is not construing CERCLA's private right of action *per se* when it construes the term "owner or operator" within the meaning of CERCLA. CERCLA's private right of action thus provides scant support for concluding, as the majority does, that Congress reserved all determinations of liability under CERCLA for the courts.

## C. Conclusion

In my view, the EPA did not exceed the scope of its delegated authority in promulgating regulations that construe the meaning of "owner or operator" within the meaning of CERCLA. Because CERCLA's secured lender exemption lacks a plain meaning and the EPA's Final Rule does not construe that exemption unreasonably, I would deny the petition and uphold the EPA's Final Rule under *Chevron.*