OPINION OF THE COURT
Lewis R. Friedman, J.
A seemingly routine motion for a judgment of foreclosure and sale has, through defendant Associates’ cross motion, *494 become one that raises significant questions about environmental concerns in buildings subject to foreclosure. The reported cases do not answer the question of whether property should be sold in foreclosure prior to remediation of an oil spill (see, Robinson, Who Bears the Risk?, NYLJ, Aug. 16, 1995, at 5, col 2). In this case the court concludes that a foreclosure sale where there has been disclosure of the environmental problem may proceed.
Associates, the mortgagor, seeks to delay the entry of judgment until there has been remediation of oil spill problems at the premises. The building at issue is a 25-story office building, rented primarily to showrooms in the garment trade. It appears that there is oil beneath the basement and in the sump. In 1994 a spill report was filed with the New York State Department of Environmental Conservation (DEC). The New York City Transit Authority had once reported oil leaking into a nearby subway, but no agency found any connection between that oil and this building. The managing agent retained by the receiver has had the oil tanks tested; no leaks were found. During the pendency of plaintiff’s motion, the court granted Associates’ application to permit it to conduct limited environmental testing of the basement in the building.
Associates’ environmental consultant, Apex Environmental Inc., noted the presence of oil stains on the walls of an elevator shaft and in the sump, and drilled three test borings through the slab in the boiler room floor. They revealed No. 6 fuel oil and water in the fill above the bedrock, three to four feet below the basement. The oil and the water were unusually warm, perhaps as a result of proximity to the boiler. It was opined that the usually high viscosity of No. 6 oil may be lessened by the presence of the water and the heat. Therefore the mixture might spread through the fill and voids. Apex was unable to delineate the extent on the oil plume and recommended additional on-site and off-site soil borings. Apex was also unable to determine the extent or manner of remediation which would ultimately be required by DEC but opined that the cost of investigation and remediation could exceed $1,000,000. Associates’ counsel has forwarded the Apex report to DEC.
The receiver of the property retained his own environmental consultant to review the problem. That company, ERM, noted the conditions that Apex had found, as well as evidence of two oil spills in 1991 and 1993, when Associates was in control of the premises. ERM arranged for cleaning the sump and removing oil and rubble in it. ERM concluded that there was only a *495 small quantity of oil below the building. It proposed to install two "recovery” wells in the basement which would contain sorbent socks to collect the oil. In addition, sorbent material would be placed in the sump, which is open to the infiltration of groundwater. It is believed that this passive system should make a substantial improvement in the problem within one year. The cost estimate is $75,000. ERM notes that the nature of the remediation and the length on the recovery efforts would be subject to DEC’s determination.
The reported cases have not yet provided guidance of the course for the court to follow when a serious environmental problem is discovered just prior to a foreclosure sale. There is no doubt that an "owner” of the property may be subject to the costs of remediation of oil contamination (Navigation Law § 181; Vandervort v Higginbotham, 222 AD2d 831; Matter of White v Regan, 171 AD2d 197, 199-200; cf., White v Long, 85 NY2d 564, 568). Those remediation costs may be substantial and may under certain circumstances even apply to mortgagees (see, e.g., United States v Fleet Factors Corp., 901 F2d 1550, 1557-1558 [11th Cir 1990]; cf., Kelley v Environmental Protection Agency, 15 F3d 1100 [DC Cir 1994]; see also, 42 USC § 9601 [20] [A]). The buyer at the foreclosure sale would be responsible for the costs but might have a claim against the party responsible for the condition (see, White v Long, supra).
Associates contends that any sale would be subject to vacatur by the purchaser in light of the problems, while plaintiff contends that a purchaser takes subject to the conditions. There are lines of cases that support both positions.
It is well established that a foreclosure sale is subject to the court’s equitable power to set it aside "to relieve of oppressive or unfair conduct” (Guardian Loan Co. v Early, 47 NY2d 515, 521; Fisher v Hersey, 78 NY 387; Crane v Stiger, 58 NY 625; King v Platt, 37 NY 155). That rule has been applied to permit a judicial disallowance of a sale "when fraud, collusion, mistake or misconduct casts suspicion on the fairness of the sale” (Bankers Fed. Sav. & Loan Assn. v House, 182 AD2d 602, 603). A buyer at a foreclosure sale is not subject to the same "buyer beware” principles that would govern a sale in a calmer setting (Lane v Chantilly Corp., 251 NY 435; Sohns v Beavis, 200 NY 268, 271-272).
If major problems are not disclosed prior to a foreclosure sale, such as 260 housing code violations, courts have permitted termination of the sale agreement (Gomez v Bobker, 128 Misc 2d 662). Similarly there are older cases which have al *496 lowed buyers to void their bids based on the difference between the physical appearance of the building and the legally permitted use (e.g., Morrow v Renniere Process, 222 App Div 100). From these cases it appears that equity will not compel a buyer to complete a sale which is unjust or unconscionable or the result of hardship or oppressive conduct, even though there is not a violation of law (see, House Mart v Giacolone, 28 Misc 2d 674, 676). Vacatur of a sale is within the sound discretion of the court (Lane v Chantilly, supra, 251 NY, at 438; Gomez v Bobker, supra; Woodside Sav. & Loan Assn. v Banks, 36 Misc 2d 954).
On the other hand there is well-established law that a buyer at foreclosure takes the property subject to the terms of the sale (Riggs v Pursell, 66 NY 193, 199; Cromwell v Hull, 97 NY 209, 212; Kingsland v Fuller, 157 NY 507, 510-511). That is, the buyer is presumed to have knowledge of all the material disclosed in the notice of sale or reasonably could be determined. Thus, for example, in Riggs v Pursell (supra), the buyer was charged with knowledge of the terms of leases to which the sale was made subject. A term of sale "subject to a state of facts an accurate survey would show” precludes a claim based on the existence of encroachments (March v Marasco, 165 App Div 348). Similarly knowledge of a superior tax lien precluded a buyer’s claim based on a prior conveyance of the property which was based on a sale pursuant to the tax lien (Aaron v Kent, 182 AD2d 960, 961).
Plaintiff contends that buyers would be on notice of an oil problem because of the visible oil stains in the elevator shaft and the sump, when they inspected the premises. There is certainly authority suggesting that similar observable factors bar subsequent claims (see, Vandervoort v Higginbotham, supra; but see, Mulry v Madison Fuel & Repair, 1995 WL 549045, Sup Ct, Nassau County, June 16, 1995, Feuerstein, J.). Obviously potential bidders on a major office building such as this would physically inspect the premises.
Here plaintiff proposes to go further and has included in the proposed judgment the following language to be included in the notice of sale and terms of sale. "Bidders are advised that Benjamin P. Feldman, Esq., the receiver of rents at the subject property ('the Receiver’), has notified the New York State Department of Environmental Conservation that the presence of fuel oil has been detected in and beneath the basement of the building located on the subject property. The Receiver has retained a consultant to assess the above-described condition *497 and develop a plan to maintain the subject property in compliance with applicable law. Bidders are invited to inspect the subject property and all records in the possession of the Receiver relating to this condition prior to the date of sale identified in this notice. Please contact the Receiver at * * There is no doubt that the inclusion of that language would put prospective purchasers on notice of the problems.
This court has no difficulty in concluding that a prospective purchaser who bids in reliance on the published notice would purchase subject to the oil spill problem. The court concludes that there would be no reason in equity to relieve a purchaser of its bid for reliance on a disclosed condition. Disclosure of the conditions will put the buyer on notice of the possible liability (see, Robinson, op. cit.).
The court is aware that there is an analogous line of cases that holds that an environmental condition such as the one at bar does not serve to impair the marketability of title. In Vandervort v Higginbotham (supra), the Third Department found that a gasoline tank problem and potential liability under Navigation Law § 181 did not render title "unmarketable”. That is the environmental problem did not hinder the owner’s "right ' "to hold his land free from probable claims of another” ’ ” (222 AD2d, supra, at 832). That is consistent with the rule that "marketability of title is concerned with impairments on title to a property, i.e., the right to unencumbered ownership and possession” (Voorheesville Rod & Gun Club v Tompkins Co., 82 NY2d 564, 571; Lincoln Trust Co. v Williams Bldg. Corp., 229 NY 313, 318 [land use zoning does not impair marketability of title]).
In similar circumstances one Justice has directed a hearing on whether a purchaser at foreclosure had actual notice of the conditions (Mulry v Madison Fuel & Repair, supra). That problem should not arise if the proposed disclosures are made. Since the Referee to sell can convey marketable title, with notice of the known environmental problem, the court has no reason to delay the sale.*
The cross motion also raises several novel procedural objections to the manner of the filing of the Referee’s report of her computation. The moving papers include a transcript of the four-hour hearing before the Referee to compute. At the end of *498 the hearing the Referee found, that the unpaid amount of the mortgage with accumulated interest was $28,944,404.87 with per diem prejudgment interest of $10,328.41; she also recommended the sale of the property as a single parcel. Associates, relying on CPLR 4319, which provides that if a decision "is not filed within the required time, upon motion of a party béfore it is filed, the court may grant a new trial,” contends that the "report” of the Referee was not filed within 30 days of the hearing and, therefore, a new hearing is required.
A threshold question is whether CPLR 4319 applies only to a Referee to determine or is also applicable to a Referee to report. There are cases that cite CPLR 4319 where there is only a reference to report (e.g., Gelb v Brown, 163 AD2d 189, 191). Yet, a review of the legislative history makes it clear that CPLR 4317-4319 are a series of sections that all relate to Referees to determine not Referees to report (see, Siegel, Practice Commentaries, McKinney’s Cons Law of NY, Book 7B, CPLR 4319, at 390). The Reviser’s comments in the Second Report of the Advisory Committee on Civil Procedure to the Legislature (1958 NY Legis Doc No. 13, at 251) make it clear that this section, derived from former Civil Practice Act § 470, is designed to provide a procedure for "decisions.” Indeed in the Second Report this section originally appeared as one subdivision of proposed section 43.2, which provided a procedure for references to determine. Ultimately that section was divided and became CPLR 4317-4319.
The text of the section also makes it clear that it applies only to Referees to determine. The statute refers to "the decision.” Only a Referee to determine may issue a "decision” while a Referee to report issues a "report.” (Compare, CPLR 4320.) Moreover, a new trial would not be required here under CPLR 4319. A new trial is not a matter of right. A motion to the court is required before a new hearing is required. This is a substantial change from the procedure under former Civil Procedure Act § 470 which permitted an aggrieved party to serve a notice of election to terminate the reference and obtain a new hearing. Moreover, the motion for a new hearing must be made before the report is filed. The cross motion here would be untimely. Since the section dealing with a reference to report, CPLR 4320, does not contain the remedy of a new trial for an untimely filing of a Referee’s report the court sees no reason to create such a remedy here.
The court also rejects Associates’ argument that a separate document labeled "report” must be filed where the report is *499 contained in the transcript of the hearing. That argument ex-halts form over substance. The court also rejects Associates’ argument that a motion to confirm the report must be made, to be followed by a separate motion for a judgment of foreclosure and sale. That is not supported by any reported case. New York foreclosure proceedings are often criticized as being far too protracted and complex in ways that do not protect any substantive rights of the parties. A single motion to confirm the report and for foreclosure and sale is the usual practice and is sufficient court intervention to protect Associates’ rights.
The court has reviewed the extended hearing testimony and finds the conclusions of the Referee to be supported by the evidence. The property consists of two towers with a common lobby, fire system and certificate of occupancy. The proof shows that at some substantial cost it may be possible to separate the fire system and divide the lobby so as to sell the property as two separate buildings. There is, however, no proof that separate sales would increase the total value to be received at an auction. Associates contends that there is an error in determining credit for interest on one tax payment. Plaintiff agrees to reduce the reported amount by $1,226.80.
The motion is granted and the cross motion is denied.

 The court also notes that there are disputes as to when the oil condition arose and which party has liability. That is a question for another day (White v Long, supra). The proposed judgment leaves the question open.