14-4645(L)
COOLING WATER INTAKE STRUCTURE COAL., ET AL. V. EPA, ET AL.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2017

(Argued: September 14, 2017    Decided:  July 23, 2018
Amended: September 27, 2018)

Docket Nos. 14-4645(L), 14-4657(CON), 14-4659(CON), 14-4664(CON),
14-4667(CON), 14-4670(CON)

_____

COOLING WATER INTAKE STRUCTURE COALITION,

*Petitioner*,

AMERICAN PETROLEUM INSTITUTE, UTILITY WATER ACT GROUP,
ENTERGY CORPORATION, AMERICAN LITTORAL SOCIETY,
ENVIRONMENT AMERICA, ENVIRONMENT MASSACHUSETTS,
RIVERKEEPER, INC., NATURAL RESOURCES DEFENSE COUNCIL,
INCORPORATED, DELAWARE RIVERKEEPER NETWORK, RARITAN
BAYKEEPER, INC., DBA NY/NJ BAYKEEPER, HACKENSACK RIVERKEEPER,
CASCO BAYKEEPER, SAVE THE BAY – NARRAGANSETT BAY, SCENIC
HUDSON, INC., SIERRA CLUB, WATERKEEPER ALLIANCE, INC.,
SOUNDKEEPER, INC., SURFRIDER FOUNDATION,

*Intervenors-Petitioners*,

CENTER FOR BIOLOGICAL DIVERSITY, LOUISIANA ENVIRONMENTAL
ACTION NETWORK, CALIFORNIA COASTKEEPER ALLIANCE, HUMBOLDT
BAYKEEPER, SUNCOAST WATERKEEPER, INC., PUGET SOUNDKEEPER
ALLIANCE,

*Intervenors*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ANDREW R. WHEELER, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,*
NATIONAL MARINE FISHERIES SERVICE,
UNITED STATES FISH AND WILDLIFE SERVICE,

*Respondents.*

—————————————————————

Before:

JACOBS, CABRANES, and LOHIER, *Circuit Judges*.

Environmental conservation groups and industry associations petition for review of a final rule promulgated by the United States Environmental Protection Agency ("EPA") pursuant to section 316(b) of the Clean Water Act, establishing requirements for cooling water intake structures at existing facilities. The Petitioners also seek review of a May 19, 2014 biological opinion jointly issued by the United States Fish and Wildlife Service and the National Marine Fisheries Service at the close of formal Endangered Species Act consultation on the final rule. Because we conclude that both the final rule and the biological opinion are based on reasonable interpretations of the applicable statutes and sufficiently supported by the factual record, and because the EPA gave adequate notice of its rulemaking, we **DENY** the petitions.

> Russell S. Frye, FryeLaw PLLC, Washington, DC, *for Petitioner* Cooling Water Intake Structure Coalition.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Administrator Andrew R. Wheeler is substituted for former Administrator Gina McCarthy as a respondent. The Clerk of the Court is directed to amend the caption accordingly.

Fredric P. Andes, Jill M. Fortney, Barnes & Thornburg LLP, Chicago, IL; Jeffrey S. Longsworth, Barnes & Thornburg LLP, Washington, DC, *for Intervenor-Petitioner* American Petroleum Institute.

KRISTY A.N. BULLEIT (Andrew J. Turner, Todd S. Mikolop, Kerry L. McGrath, *on the brief*), Hunton & Williams LLP, Washington, DC, *for Intervenors-Petitioners* Utility Water Act Group, Entergy Corporation.

REED W. SUPER, EDAN ROTENBERG, Super Law Group, LLC, New York, NY, *for Intervenors-Petitioners* Riverkeeper Inc., American Littoral Society, Casco Baykeeper, Delaware Riverkeeper Network, Hackensack Riverkeeper, Natural Resources Defense Council, Inc., Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper, Save the Bay –Narragansett Bay, Scenic Hudson, Inc., Sierra Club, Soundkeeper, Inc., Surfrider Foundation, Waterkeeper Alliance, Inc., *and for Intervenors* Center for Biological Diversity, Louisiana Environmental Action Network, California Coastkeeper Alliance, Humboldt Baykeeper, Suncoast Waterkeeper, Inc., Puget Soundkeeper Alliance.

Eric E. Huber, Sierra Club, Boulder, CO, *for Intervenor-Petitioner* Sierra Club, *and for Intervenors* Center for Biological Diversity, California Coastkeeper Alliance, Humboldt Baykeeper, Louisiana Environmental

Action Network, Suncoast Waterkeeper, Inc.

Charles C. Caldart, National Environmental Law Center, Seattle, WA, *for Intervenors-Petitioners* Environment America, Environment Massachusetts.

PERRY M. ROSEN, United States Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC; BRIDGET KENNEDY MCNEIL, United States Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Denver, CO (Simi Bhat, United States Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Clifford E. Stevens, Jr., United States Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Denver, CO, *on the brief*; Richard T. Witt, Alexis Wade, United States Environmental Protection Agency, Office of General Counsel, *of counsel*), *for Respondents*.

Andrew K. Jacoby, Varadi, Hair & Checki, LLC, New Orleans, LA (Ann Brewster Weeks, Legal Director, Clean Air Task Force, Boston, MA, *of counsel*), *for Amicus Curiae* Clean Air Task Force.

LOHIER, *Circuit Judge*:

In these consolidated cases, several environmental conservation groups and industry associations petition for review of a final rule promulgated four years ago, in August 2014, by the United States Environmental Protection Agency ("EPA") pursuant to section 316(b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1326(b), establishing requirements for cooling water intake structures ("CWISs") at existing regulated facilities, see National Pollutant Discharge Elimination System—Final Regulations to Establish Requirements for Cooling Water Intake Structures at Existing Facilities and Amend Requirements at Phase I Facilities, 79 Fed. Reg. 48,300 (Aug. 15, 2014) (codified at 40 C.F.R. pts. 122, 125) ("Final Rule" or "Rule").[1]  The Petitioners also seek review of a May 19, 2014 biological opinion jointly issued by the United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS," and, together with the FWS, the "Services") at the close of formal Endangered Species Act ("ESA") consultation on the Final Rule.  The Government continues to defend the Rule today.  Because we conclude, among other things, that both the Rule and the

---

[1] The various abbreviations in this opinion are defined both in text and in a separate glossary set forth in the Appendix.

biological opinion are based on reasonable interpretations of the applicable statutes and sufficiently supported by the factual record, and because the EPA gave adequate notice of its rulemaking, we **DENY** the petitions for review.

**BACKGROUND**

To start, we describe CWISs; their general impact on the environment; and the statutes, regulations, and rules relevant to these petitions. We then provide an overview of the relevant regulatory and procedural history and a summary of the arguments advanced in the various petitions before us.

1. Cooling Water Intake Structures

To dissipate waste heat, power plants and manufacturing facilities use CWISs to extract large volumes of water—nearly 75 trillion gallons annually— from nearby water sources. The force of inflowing water can trap, or "impinge," larger aquatic organisms against the structures and draw, or "entrain," smaller aquatic organisms into a facility's cooling system. Impingement and entrainment kill hundreds of billions of aquatic organisms from waters of the United States each year.

The harm to aquatic organisms caused by a CWIS most directly relates to the amount of water the structure withdraws, which in turn depends on the type

of cooling system the facility uses. "Once-through" cooling systems draw cold water from a waterbody and return heated water to the waterbody in a continuous flow. See Riverkeeper, Inc. v. EPA, 358 F.3d 174, 182 n.5 (2d Cir. 2004) ("Riverkeeper I"). "Closed-cycle" cooling systems generally recirculate the same cooling water within a CWIS by using towers or reservoirs to dissipate heat from the water. Id.; see also 79 Fed. Reg. at 48,333. Closed-cycle cooling withdraws approximately 95 percent less water than once-through cooling.

2. Statutory Framework

A. The Clean Water Act

The express purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Sections 301 and 306 of the CWA broadly authorize the EPA to establish pollution discharge standards. Id. §§ 1311, 1316. In 1972 Congress amended the CWA to specifically address the operation of CWISs. See Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816; see also Riverkeeper I, 358 F.3d at 184 (describing the 1972 amendments as marking a "sea of change" in Congress's approach to water pollution). In section 316(b), it directed the EPA to establish standards governing the operation of CWISs:

7

Any standard established pursuant to [CWA section 301] or [CWA section 306] and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact.

33 U.S.C. § 1326(b). Section 316(b) lists no specific factors that the EPA should consider in establishing the applicable "best technology available" ("BTA") standard. We have held that "interpretation of section 316(b) is informed by the two provisions it cross-references," Riverkeeper, Inc. v. EPA, 475 F.3d 83, 91 (2d Cir. 2007) ("Riverkeeper II"), rev'd on other grounds, Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208 (2009), but that the EPA need not comply with "every statutory directive contained" in those two provisions when acting pursuant to section 316(b), id. (quoting Riverkeeper I, 358 F.3d at 187). Moreover, the EPA may consider "the benefits derived from reductions [in adverse environmental impact] and the costs of achieving them" when establishing the BTA. Entergy, 556 U.S. at 219.

The standards promulgated under CWA sections 301, 306, and 316(b) are implemented by permits issued through the National Pollutant Discharge Elimination System ("NPDES"). See 33 U.S.C. § 1342; 40 C.F.R. §§ 122.44(b)(3), 125.90(a). "An NPDES permit serves to transform generally applicable . . .

8

standards . . . into the obligations . . . of the individual discharger . . . ." EPA v. California ex rel. State Water Res. Control Bd., 426 U.S. 200, 205 (1976). NPDES permits are issued by the EPA or, if the EPA has approved a State's permitting program, by the Director of the NPDES program for the State.[2] See 33 U.S.C. § 1342. Under the authorized State programs, Directors must submit draft permits to the EPA for review. Id. § 1342(d)(1)–(2). If a Director fails to amend the permit in response to any EPA objections, the EPA may federalize the permit (i.e., reclaim permitting authority for that permit). Id. § 1342(d)(4). And if a State fails to administer the NPDES program in accordance with standards promulgated pursuant to the CWA, the EPA may withdraw approval of the State program. Id. § 1342(c).

B. The Endangered Species Act

In enacting the ESA, Congress wanted to ensure "that all Federal departments and agencies . . . seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1). To "reverse the trend toward species extinction," Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978), the ESA provides

---

[2] As of 2014, when the Final Rule was published, forty-six States operated an EPA-approved NPDES permitting program. 79 Fed. Reg. at 48,312. In June 2018 Idaho became the forty-seventh State to receive the EPA's approval. See 83 Fed. Reg. 27,769, 27,770 (June 14, 2018).

for the listing of species as threatened or endangered and the designation of their critical habitats, 16 U.S.C. § 1533. Once a species is listed, certain statutory protections apply. For example, section 9 of the ESA prohibits the "take"[3] of endangered species and those threatened species to which the Services have extended protection, 16 U.S.C. § 1538(a)(1)(B), except that take "incidental" to an otherwise lawful activity may be exempted pursuant to the procedures set forth in ESA sections 7 or 10, id. § 1539(a)(1)(B). Section 7 of the ESA directs federal agencies, in consultation with one or both of the Services, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species," or to adversely modify critical habitats designated for such species.[4] Id. § 1536(a)(2). A federal agency must consult with the Services on a proposed action whenever there is "reason to believe that an endangered species or a threatened species may be present in the area affected by [the proposed action]

---

[3] The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).
[4] The ESA's implementing regulations define the phrase "[j]eopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

and that implementation of such action will likely affect such species." Id. § 1536(a)(3); see 50 C.F.R. § 402.14(a) (requiring consultation where the acting agency determines that its action "may affect" listed species or critical habitat).

Consultation with the Services may be informal or formal. Informal consultation is an optional process to determine whether formal consultation is necessary. 50 C.F.R. § 402.13(a). As part of informal consultation, the acting agency may prepare a "biological evaluation" that analyzes the potential effects of a proposed action on listed species and their critical habitat. See Memorandum of Agreement Between the Environmental Protection Agency, Fish and Wildlife Service and National Marine Fisheries Service Regarding Enhanced Coordination Under the Clean Water Act and Endangered Species Act, 66 Fed. Reg. 11,202, 11,210 (Feb. 22, 2001) ("MOA"). If the acting agency determines, with the written concurrence of the consulting Service, that the action "is not likely to adversely affect" listed species or critical habitat, the consultation process ends. 50 C.F.R. § 402.13(a); see id. §§ 402.12(k)(1), 402.14(b)(1). But if either the acting agency or the consulting Service determines that the proposed action is "likely to adversely affect" listed species or critical habitat, the agency and the Service must engage in formal consultation. Id.

11

§ 402.13(a); see id. § 402.14(a)–(b). At the end of formal consultation, the Service must, using "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8), prepare a biological opinion with both a "detailed discussion of the effects of the action on listed species or critical habitat," 50 C.F.R. § 402.14(h)(2), and a position "as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," id. § 402.14(g)(4). If the Service concludes that the action is likely to jeopardize listed species, the biological opinion must suggest "reasonable and prudent alternatives" to the agency's proposed action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5). If the Service concludes that the action is not likely to jeopardize listed species but that incidental take is reasonably likely to occur, the Service is required to provide an incidental take statement ("ITS") that meets the requirements set forth in 16 U.S.C. § 1536(b)(4). A taking that complies with measures specified in an ITS "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

## C.  The Administrative Procedure Act

The Administrative Procedure Act ("APA") requires a federal agency conducting notice-and-comment rulemaking to include in its notice of proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  A final rule "need not be an exact replica of the rule proposed in the [n]otice," only a "logical outgrowth."  Riverkeeper II, 475 F.3d at 113 (quotation marks omitted).  A central question under the APA is "whether the agency's notice would fairly apprise interested persons of the subjects and issues of the rulemaking."  Nat'l Black Media Coal. v. FCC, 791 F.2d 1016, 1022 (2d Cir. 1986) (quotation marks omitted).

### 3.  Regulatory History

Our decisions in Riverkeeper I, 358 F.3d 174, and Riverkeeper II, 475 F.3d 83, discuss at length the history of the EPA's rulemaking pursuant to section 316(b) of the CWA.  We assume familiarity with those decisions and therefore provide only a brief overview of the various stages of the rulemaking relevant to these petitions.

The EPA first promulgated a regulation implementing section 316(b) in 1976.  See 41 Fed. Reg. 17,387 (Apr. 26, 1976).  The Fourth Circuit remanded

13

certain aspects of that regulation for procedural reasons, see Appalachian Power Co. v. Train, 566 F.2d 451, 457 (4th Cir. 1977), and the EPA subsequently withdrew the remanded regulation, see 44 Fed. Reg. 32,854, 32,956 (June 7, 1979).

In 1993 environmental conservation groups sued the EPA to compel the issuance of regulations under section 316(b), which had already been significantly delayed. An amended 1995 consent decree required the EPA to promulgate new regulations in three phases, each addressing a different category of facilities. See Riverkeeper, Inc. v. Whitman, No. 93 Civ. 0314(AGS), 2001 WL 1505497, at *1 (S.D.N.Y. Nov. 27, 2001); Cronin v. Browner, 898 F. Supp. 1052, 1055 (S.D.N.Y. 1995). We describe each phase in turn.

The EPA's Phase I rule, published in 2001,[5] established uniform national BTA standards for new facilities based on closed-cycle cooling and offered two alternative compliance options. See 40 C.F.R. § 125.84; 79 Fed. Reg. at 48,315–16. In Riverkeeper I, we upheld the Phase I rule with the exception of the compliance option based on "restoration measures," holding that restoration was

---

[5] Also in 2001, the EPA and the Services entered into the MOA, which addressed the protection of endangered and threatened species under the CWA's programs for water quality standards and NPDES permitting. See 66 Fed. Reg. 11,202. The MOA encouraged greater cooperation and communication among the Services, the EPA, and Directors in ensuring that these programs protect ESA-listed species consistent with the scope of the EPA's authority under the CWA. Id. at 11,203–04.

14

inconsistent with Congress's expressed intent in section 316(b) that the EPA directly regulate the "design" of CWISs. 358 F.3d at 189–91.

The EPA's Phase II rule, published in 2004, provided that large, existing power plants could comply with BTA performance standards by choosing from a suite of designated technologies that would reduce impingement mortality by 80 to 95 percent and entrainment by 60 to 90 percent. See 69 Fed. Reg. 41,576, 41,590 (July 9, 2004). The Phase II rule identified five compliance options, including a "cost-benefit comparison" option that allowed site-specific variances from the rule's standards if a facility demonstrated that its compliance costs would be "significantly greater than" the benefits. Id. at 41,591, 41,597. In Riverkeeper II, we held that section 316(b) does not authorize the EPA to determine the BTA or provide for site-specific determinations of the BTA based on a cost-benefit analysis. 475 F.3d at 101, 114, 130–31. Because we could not determine whether the EPA had relied on a cost-benefit analysis in selecting the rule's suite of technologies as the BTA, we remanded the Phase II rule for the EPA to clarify the basis for its decision and possibly to reassess the BTA. Id. at 101, 105. In Entergy Corp. v. Riverkeeper, Inc., the Supreme Court granted certiorari only as to the question whether section 316(b) "authorizes the EPA to compare costs with

15

benefits in determining 'the best technology available for minimizing adverse environmental impact' at [CWISs]." 556 U.S. at 217. The Supreme Court answered that question in the affirmative, "express[ing] no view on the remaining bases for the Second Circuit's remand." Id. at 226.

Lastly, the EPA's Phase III rule, published in 2006, established standards for new offshore facilities, smaller existing power plants, and existing manufacturing facilities. See 71 Fed. Reg. 35,006 (June 16, 2006). After petitioners challenged the Phase III rule in the Fifth Circuit, the EPA requested and received a partial remand of the rule so that it could reconsider the provisions addressing existing facilities in light of Entergy. See ConocoPhillips Co. v. EPA, 612 F.3d 822, 832, 842 (5th Cir. 2010).

4. The Challenged Rule

In response to the Phase II and III remands, the EPA proposed a new round of rulemaking for all existing facilities and new units at existing facilities. See National Pollutant Discharge Elimination System—Cooling Water Intake Structures at Existing Facilities and Phase I Facilities, 76 Fed. Reg. 22,174 (Apr. 20, 2011). Several rounds of comment on the proposed rule followed, and the

EPA ultimately reviewed comments from over 1,100 organizations and individuals. 79 Fed. Reg. at 48,352.

In 2012 the EPA initiated ESA consultation with the Services on the effects of the proposed rule on listed species and their critical habitat. During informal consultation, the Services disagreed with the EPA's determination, in a draft biological evaluation, that the proposed rule was unlikely to have adverse effects on listed species. On June 18, 2013, after several meetings between the agencies, the EPA requested formal section 7 consultation and submitted a final biological evaluation. With that evaluation in hand, in late 2013 the Services preliminarily concluded that the proposed rule would cause "jeopardy" as defined in the ESA. The EPA and the Services continued to discuss the proposed rule and revisions, culminating in a draft final rule in March 2014. Soon thereafter, in May 2014, the Services jointly issued a biological opinion, concluding that although the operation of CWISs could have significant adverse effects on listed species and their critical habitat, the proposed rule's inclusion of certain process-based protections ensured that it was not likely to "jeopardize" the continued existence of listed species or "adversely modify" critical habitat within the meaning of ESA section 7. See U.S. Fish and Wildlife Service & National Marine Fisheries Service,

Endangered Species Act Section 7 Consultation Programmatic Biological Opinion on the U.S. Environmental Protection Agency's Issuance and Implementation of the Final Regulations Section 316(b) of the Clean Water Act 71 (2014) ("Bio. Op."). The biological opinion also included an ITS, which found that the "large scale and broad scope" of the proposed rule precluded an accurate estimate of the precise amount of incidental take. Id. at 76. The Services therefore deferred quantification of incidental take to the site-specific permitting process laid out in the proposed rule.

The Final Rule promulgated by the EPA and challenged by the Petitioners applies to existing power plants and manufacturing facilities that use CWISs to withdraw more than 2 million gallons of water per day ("mgd"), of which 25 percent or more is used for cooling.[6] See 79 Fed. Reg. at 48,304–05. As we discuss in more detail and as relevant below, the Rule establishes impingement and entrainment standards for existing facilities and for new units at existing facilities, id. at 48,321–23, and it implements several processes to ensure compliance with the ESA, id. at 48,380–83.

---

[6] The Rule covers 99.8 percent of total water withdrawals by industrial sources in the United States. 79 Fed. Reg. at 48,308.

### 5. Procedural History

After the Final Rule was published, petitions for review were filed in six Circuits. The Fourth Circuit consolidated the petitions, allowed the Petitioners to intervene in one another's suits, and transferred the consolidated petitions to this Circuit pursuant to 28 U.S.C. § 2112(a)(5). We then granted the Petitioners leave to amend their petitions to include challenges to the Services' biological opinion and to add the Services as respondents. We also granted the motion filed by the Center for Biological Diversity, Louisiana Environmental Action Network, California Coastkeeper Alliance, Humboldt Baykeeper, Suncoast Waterkeeper, Inc., and Puget Soundkeeper Alliance for leave to intervene as petitioners.

### 6. The Petitions

Four petitions for review are before us.

#### A. Environmental Petition

The first petition, filed by the self-described "Environmental Petitioners" and "Environmental Intervenors" (collectively, the "Environmental Petitioners"),[7] argues that: (1) the Rule's entrainment and impingement

---

[7] American Littoral Society, Environment America, Environment Massachusetts, Riverkeeper, Inc., Natural Resources Defense Council, Incorporated, Delaware

requirements violate section 316(b) of the CWA in several ways; (2) the Rule's definition of "new unit" is arbitrary and capricious under the APA insofar as it excludes rebuilt, repowered, and replaced units; (3) the Services violated section 7 of the ESA and its implementing regulations, especially by finding that the Rule incorporates adequate process-based protections to avoid jeopardizing listed species; and (4) the Services' ITS fails to meet the requirements set forth in section 7(b)(4) of the ESA. The Environmental Petitioners seek vacatur and remand of the Final Rule and request that we declare unlawful and set aside the biological opinion and ITS issued by the Services.

### B. Industry Association Petition

The second petition, filed by several industry associations we refer to collectively as "UWAG,"[8] challenges the Rule primarily on the grounds that: (1) the EPA exceeded its authority under the CWA; (2) the Services violated the ESA by, among other things, issuing a biological opinion that relied on an

---

Riverkeeper Network, Raritan Baykeeper, Inc., d/b/a NY/NJ Baykeeper, Hackensack Riverkeeper, Casco Baykeeper, Save the Bay – Narragansett Bay, Scenic Hudson, Inc., Sierra Club, Waterkeeper Alliance, Inc., Soundkeeper, Inc., Surfrider Foundation, Center for Biological Diversity, Louisiana Environmental Action Network, California Coastkeeper Alliance, Humboldt Baykeeper, Suncoast Waterkeeper, Inc., and Puget Soundkeeper Alliance.

[8] Utility Water Act Group, Entergy Corporation, Cooling Water Intake Structure Coalition, and American Petroleum Institute.

erroneous environmental baseline; and (3) the EPA violated the APA by failing to provide notice of and an opportunity to comment on certain provisions of the Rule adopted at the Services' behest. UWAG requests that we vacate these so-called "Service-driven" provisions and set aside the Services' biological opinion.

## C. American Petroleum Institute Petition

The third petition, separately filed by the American Petroleum Institute ("API"), argues that the EPA violated the APA when it concluded that manufacturing facilities will incur minimal compliance costs in meeting the Rule's standards for "new units," and when in the proposed rule it defined "new unit" so vaguely that interested parties were deprived of notice and an opportunity to comment.

## D. CWIS Coalition Petition

The fourth petition, separately filed by the Cooling Water Intake Structure Coalition ("CWIS Coalition" or "Coalition"), argues that the EPA acted arbitrarily and capriciously in violation of the APA with respect to permit application requirements and with respect to requirements for intake structures that withdraw little or no water exclusively for cooling purposes.

**DISCUSSION**

1. Jurisdiction

We have jurisdiction to review the Final Rule pursuant to CWA section 509(b)(1), 33 U.S.C. § 1369(b)(1). See Riverkeeper II, 475 F.3d at 95. Because evaluating the biological opinion's "evidentiary and analytic basis is . . . integral to reviewing the EPA's final decision," we can "consider the adequacy of both the section 7 consultation and the [b]iological [o]pinion that resulted from it while reviewing the EPA's final decision." Defs. of Wildlife v. EPA, 420 F.3d 946, 956 (9th Cir. 2005), rev'd on other grounds, Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644 (2007).

2. Standard of Review

Our substantive review of the Rule has two steps. "First, we examine the regulation against the statute that contains the [agency's] charge." Riverkeeper II, 475 F.3d at 95 (quotation marks omitted). If Congress "has directly spoken to the precise question at issue" and has unambiguously expressed its intent, we must give effect to that intent. Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984). If the statute is silent or ambiguous, we ask only "whether the agency's answer is based on a permissible construction of the

22

statute," id. at 843, that is, we ask whether the agency's action is "arbitrary, capricious, or manifestly contrary to the statute," Riverkeeper I, 358 F.3d at 184 (quotation marks omitted). "Second, if the agency has followed Congress's unambiguously expressed intent or permissibly construed an ambiguous statute, we measure the regulation against the record developed during the rulemaking," Riverkeeper II, 475 F.3d at 95 (quotation marks omitted), holding it unlawful only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. (quoting 5 U.S.C. § 706(2)(A)). Our review is "narrow, limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Riverkeeper I, 358 F.3d at 184 (quotation marks omitted). Because "we lack the [agencies'] expertise when it comes to scientific or technical matters," id., we look only to see whether the agency "examined the relevant data and articulated a satisfactory explanation for its action," and whether there is a "rational connection between the facts found and the choice made," Nat. Res. Def. Council v. FAA, 564 F.3d 549, 555 (2d Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). We apply the same analysis to the Services'

23

biological opinion.  See Bennett v. Spear, 520 U.S. 154, 177–78 (1997); Defs. of Wildlife v. U.S. Dep't of the Navy, 733 F.3d 1106, 1114–15 (11th Cir. 2013).

We also review the Rule for compliance with the procedural requirements of the APA.  See 5 U.S.C. § 553(b), (c).  In particular, we will remand for further proceedings if an agency fails to comply with the APA's notice-and-comment provisions.  Riverkeeper II, 475 F.3d at 96.

With these general principles in mind, we consider first the several challenges raised by the Environmental Petitioners and then turn to the arguments raised by UWAG, API, and the CWIS Coalition.

### 3.  The Environmental Petitioners

We address the Environmental Petitioners' broader CWA-based arguments followed by their arguments based on the APA and the ESA.

#### A.  Environmental Petitioners' CWA-Based Challenges[9]

##### i.  Entrainment Requirements

The EPA recognized that closed-cycle cooling is the most effective system for minimizing entrainment.  79 Fed. Reg. at 48,342.  But the EPA also concluded

---

[9] As a preliminary matter, we deny the Environmental Petitioners' motion to compel the Respondents to amend the certified list of documents comprising the administrative

24

that significant barriers at many existing facilities prevent retrofitting to incorporate closed-cycle cooling systems. Id. at 48,340–42. The EPA therefore decided that closed-cycle cooling is not the best technology actually "available" on a national basis and declined to mandate it for all facilities as the required entrainment technology. Id. The EPA also found that there is no alternative high- or intermediate-performing technology that is nationally available to minimize entrainment. Id. at 48,330. For that reason, the EPA established that a Director should determine the BTA to limit entrainment on a site-specific basis during the NPDES process, considering the factors identified in the Rule and information that facilities are required to provide under 40 C.F.R. § 122.21(r). Id. at 48,351–52; see also 40 C.F.R. §§ 122.43(a), 125.98(f). As contemplated by the Rule, the Director determines the BTA (which may be closed-cycle cooling) at

---

record to include certain specified additional documents. The Environmental Petitioners have narrowed the scope of this motion to encompass just seven documents, all of which are draft documents produced by the Services during consultation with the EPA. The Respondents have produced a privilege log that adequately describes the nature of the seven requested documents and their rationale for classifying those documents as deliberative and therefore privileged. See Fed. R. Civ. P. 26(b)(5)(A)(ii). We see nothing in the privilege log that would disturb the "presumption of regularity" afforded to the agencies' certified record. Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).

each facility and ensures implementation of that technology through NPDES permit conditions.

The Environmental Petitioners argue that, in promulgating these entrainment provisions, the EPA violated CWA section 316(b) in four ways.

First, the Environmental Petitioners argue that section 316(b) requires the EPA to establish a single, national, categorical entrainment standard. That might be quite advantageous, but we have already held that "the EPA's decision to regulate some aspects of [CWISs] on a site-specific basis is within its authority and reasonable." Riverkeeper I, 358 F.3d at 198; see id. at 203 ("The [CWA] does not forbid the EPA from addressing certain environmental problems on a case-by-case basis where categorical regulation is not technologically feasible . . . ."). As we explained in Riverkeeper I, section 316(b) "merely directs the EPA to require every [CWIS] subject to regulation . . . to reflect the 'best technology available.'" Id. at 203. "It does not compel the EPA to regulate either by one overarching regulation . . . or on a case-by-case basis . . . ." Id.; see also Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 566–67 (D.C. Cir. 2002) (upholding the EPA's decision to regulate color pollution on a case-by-case basis during the NPDES permitting process where the EPA found that the impact of color pollutants

depended on "highly site-specific conditions" (quotation marks omitted)); Maier, P.E. v. EPA, 114 F.3d 1032, 1043 (10th Cir. 1997).[10]  Here, the EPA found that a "one-size-fits-all" approach to entrainment was infeasible.  79 Fed. Reg. at 48,342. In light of this finding and our precedent, we conclude that the EPA acted both reasonably and within its authority in adopting a case-by-case approach to entrainment standards.  We also reject the Environmental Petitioners' related argument that the EPA inappropriately abdicated its statutory obligation to set standards for entrainment reduction.

Second, the Environmental Petitioners argue that the EPA acted arbitrarily and capriciously when it concluded that closed-cycle cooling is not nationally available.  We are not persuaded.  The EPA identified three factors that, in combination, render closed-cycle cooling unavailable on a national scale: first, about 25 percent of facilities have constraints on land availability (e.g., limited physical space, restrictive zoning requirements) that would prevent them from

---

[10] The Environmental Petitioners' reliance on E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112 (1977), is misplaced.  There, the Supreme Court held only that section 301 of the CWA does not require the EPA to establish effluent limitations on a site-specific basis, and that the EPA has the authority to issue regulations establishing effluent limitations for classes of power plants.  Id. at 128, 133–36; see Entergy, 556 U.S. at 223 ("[U]nder Chevron, that an agency is not required to do so does not mean that an agency is not permitted to do so.").

retrofitting; second, retrofitting would increase the emission of various pollutants at facilities because of the energy required to retrofit; and third, due to the time required to design and construct closed-cycle systems, facilities nearing the end of their useful lives would not see a net benefit in entrainment reduction resulting from a retrofit. 79 Fed. Reg. at 48,341–42. As to the first factor, the Environmental Petitioners argue that the 25 percent land availability figure is unsupported by the administrative record. Although the EPA acknowledged that its data was inadequate to predict with certainty the number of facilities facing space constraints, we decide only whether the data available provided the EPA an adequate basis for its decision. See Miami-Dade Cty. v. EPA, 529 F.3d 1049, 1064–65 (11th Cir. 2008); Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 1004–05 (D.C. Cir. 1997). Here, the EPA rationally concluded, based on the studies and surveys in the administrative record, that geographic limitations would curtail the availability of closed-cycle cooling at a significant number of facilities. With respect to the second and third factors, the Environmental Petitioners argue that air pollution and limited remaining useful life do not affect "availability," which they define as "technologically feasible." Perhaps, but the EPA's different interpretation of "availability" is rational. See Riverkeeper I, 358 F.3d at 194–96

(concluding that the EPA acted rationally in determining that dry cooling was not nationally available due to its high cost, air emissions resulting from increased energy use, and other factors).  The Environmental Petitioners also fault the EPA for relying in part on a "cost-benefit concern," Envtl. Br. 54, even though, in the Rule's preamble, the EPA disclaimed that costs were a "dispositive factor," 79 Fed. Reg. at 48,340.  Yet even assuming that the EPA compared costs to benefits (direct and indirect) in deciding whether to designate closed-cycle cooling as the BTA, the Environmental Petitioners have not explained why the EPA could not do so to inform its analysis of availability.  See Entergy, 556 U.S. at 218–19 (BTA may "describe the technology that most efficiently produces some good" and may "involve a consideration of the benefits derived from reductions [in adverse environmental impact] and the costs of achieving them").  Indeed, agencies are ordinarily required to consider the relative costs and benefits of a regulation as part of reasoned decisionmaking.  See Michigan v. EPA, 135 S. Ct. 2699, 2707 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").  For all of these reasons, we reject the Environmental Petitioners' second argument

under the CWA and hold that the EPA did not act arbitrarily and capriciously in determining that the combination of three "availability" factors justified rejecting a national standard based on closed-cycle cooling.[11]

The Environmental Petitioners' third argument under the CWA is that the Rule fails adequately to define "best technology available," leaving Directors with "unfettered discretion" to establish entrainment requirements at individual facilities. Envtl. Br. 62 (quoting Riverkeeper II, 475 F.3d at 111 n.22). We do not think the Rule gives Directors excessive discretion. As the Environmental Petitioners acknowledge, the Rule lists eleven factors that a Director may consider when establishing a site-specific entrainment standard, five of which the Director must consider. 40 C.F.R. § 125.98(f)(2)–(3). The Environmental Petitioners nonetheless argue that because the Rule provides no guidance on how these factors should be weighed, Directors may "reach and justify any and all decisions on any grounds that they please." Envtl. Br. 64–65. Not so. After a

---

[11] We also reject the Environmental Petitioners' argument that the EPA could have addressed its availability concerns by creating a variance procedure that exempts certain facilities from the Rule's standards. The existence of other permissible approaches to regulation does not render the EPA's chosen approach irrational. See Entergy, 556 U.S. at 218. Moreover, the EPA expressly considered a variance procedure and concluded that, due to the "complex interaction" of several factors limiting the availability of closed-cycle cooling, a variance procedure would be less precise than site-specific balancing of all relevant factors. See 79 Fed. Reg. at 48,343.

Director considers the required and optional factors set forth in the Rule, which themselves limit her discretion, she must explain to the EPA in writing why she rejected any better-performing technologies. 40 C.F.R. § 125.98(f)(1). The EPA may then review the Director's explanation and object if it disagrees with the Director's determination of the BTA. Id. § 123.44; 79 Fed. Reg. at 48,383. This scheme hardly leaves the Director's determination of the BTA "virtually unreviewable." Envtl. Br. 66.

Finally, the Environmental Petitioners argue that the EPA exceeded its statutory authority by allowing Directors to base their BTA determinations in part on a cost-benefit analysis. See 40 C.F.R. § 125.98(f)(2)(v), (f)(4). As noted above, the Supreme Court held in Entergy that the EPA may weigh costs against benefits when setting BTA standards under section 316(b). 556 U.S. at 218–20, 226. The Environmental Petitioners acknowledge Entergy but insist that the Court "did not give its blessing to all forms of cost-benefit analysis," endorsing it only where necessary to prevent "extreme disparities" between costs and benefits. Envtl. Br. 66, 70. We do not read Entergy so narrowly. Although the Court in Entergy noted that the EPA, in the Phase II rule, had "sought only to avoid extreme disparities between costs and benefits," 556 U.S. at 224, it held that

the EPA may generally "rel[y] on cost-benefit analysis" in promulgating standards pursuant to section 316(b), id. at 218–22, 226, and emphasized that section 316(b)'s silence on the permissibility of cost-benefit analysis "convey[s] nothing more than a refusal to tie the agency's hands as to whether cost-benefit analysis should be used, and if so to what degree," id. at 222. And although the Environmental Petitioners argue that the Supreme Court did not explicitly approve the delegation of authority to consider costs and benefits to individual Directors, they fail to explain why Directors would be precluded from considering the same factors the EPA could have considered had it chosen to establish a national, categorical standard.

For these reasons, we reject the Environmental Petitioners' CWA-based challenges to the Rule's entrainment requirements.

ii. Impingement Requirements

The EPA also declined to adopt closed-cycle cooling as the BTA to minimize impingement mortality at existing facilities, largely for the same reasons it identified with respect to entrainment. See 79 Fed. Reg. at 48,325, 48,343. Instead, the EPA determined that "modified traveling screens with a

fish-friendly fish return" constitute the BTA.[12]  Id. at 48,329, 48,337.  The EPA projected that these screens will achieve, on average, a 76 percent survival rate (in other words, reduce impingement mortality to no more than 24 percent).  Id. at 48,337 (citing 40 C.F.R. § 125.94(c)(7)).  Under the Rule's impingement provisions, a regulated facility may choose from seven compliance options that reduce impingement mortality, including any type of "modified traveling screen" that meets the Rule's definition and that the facility demonstrates to the Director is the BTA at that particular site.  See 40 C.F.R. § 125.94(c)(1)–(7); 79 Fed. Reg. at 48,321.  The Environmental Petitioners argue primarily that these impingement provisions violate the CWA in three ways.

First, the Environmental Petitioners argue that closed-cycle cooling, not modified traveling screens, is the BTA for minimizing impingement mortality. But as with the Rule's entrainment standards, the EPA rationally concluded that closed-cycle cooling is not nationally available.  Therefore, it was neither arbitrary nor capricious for it to reject closed-cycle cooling as the BTA to reduce impingement mortality nationwide.

---

[12] A traveling screen is a mesh screen that prevents debris from entering an intake system.  A modified traveling screen is a traveling screen that incorporates certain features to protect aquatic organisms, such as a gentle vacuum that returns fish to the water.

Second, the Environmental Petitioners contend that even if the EPA's BTA determination were lawful, the Rule violates the CWA because it fails to ensure that regulated facilities will meet the 76 percent survival rate standard set forth in 40 C.F.R. § 125.94(c)(7). Specifically, they argue that two of the seven options for reducing impingement mortality, 40 C.F.R. § 125.94(c)(6) and (c)(5), are "loopholes" that allow regulated facilities to avoid complying with the 76 percent standard and that "impose[] no standard at all." Envtl. Br. 75–76. One of these two options allows a facility to "operate a system of technologies, management practices, and operational measures" that "the Director determines is the [BTA] for impingement reduction" at that particular site. 40 C.F.R. § 125.94(c)(6). To avail itself of this option, a facility must submit an "impingement technology performance optimization study" under 40 C.F.R. § 122.21(r)(6) that includes at least two years of biological data and describes the technologies that will be used to minimize impingement mortality. Id. § 125.94(c)(6). The Director's determination will then "be informed" by comparing the study results to the 76 percent standard. Id. Although the Environmental Petitioners complain that this language does not technically require compliance with the 76 percent standard, we conclude that the EPA acted

34

rationally in affording Directors some discretion to determine whether a particular facility's impingement reduction efforts are adequate, especially because, as the EPA persuasively explained, the overall impingement reduction at a particular site cannot always be measured strictly by survival or mortality percentages. See 79 Fed. Reg. at 48,365.

The other compliance option challenged by the Environmental Petitioners allows facilities to operate a "modified traveling screen" that meets the definition set forth in 40 C.F.R. § 125.92(s) and "is the [BTA] for impingement reduction at the site." 40 C.F.R. § 125.94(c)(5) (emphasis added). Relying on Riverkeeper II, the Environmental Petitioners argue that this provision does not require facilities to meet the 76 percent standard or even require a Director's decision to be "informed" by that standard, allowing facilities to choose a type of modified traveling screen that does not achieve the 76 percent survival rate. But Riverkeeper II does not support the Environmental Petitioners' position. There we held that the EPA may set national performance standards as ranges so long as it "require[s] facilities to minimize the adverse environmental impacts attributable to their [CWISs] to the best degree they can." Riverkeeper II, 475 F.3d at 105 (emphasis added); see also id. at 106 (EPA should "require facilities to

choose technologies that produce the greatest reduction possible" within the ranges). That is essentially what the EPA has done here. A facility may choose the modified traveling screen option only when "the Director determines [that it] is the [BTA] for impingement reduction at the site," that is, only when a facility shows that "the technology is or will be optimized to minimize impingement mortality of all non-fragile species." 40 C.F.R. § 125.94(c)(5); see also 79 Fed. Reg. at 48,325, 48,346. Further, the Director must include in the permit "verifiable and enforceable . . . conditions that ensure the technology will perform as demonstrated." 40 C.F.R. § 125.94(c)(5); 79 Fed. Reg. at 48,329. Under certain circumstances, the Director can also require additional protective measures that must be incorporated into the permit. See 40 C.F.R. § 125.94(c)(8)–(9), (g). This process adequately ensures that a modified traveling screen at a particular site is in fact the BTA for reducing impingement mortality at that site.

The third way in which these impingement provisions violate the CWA, the Environmental Petitioners argue, is that the EPA arbitrarily excluded fragile species from the calculation of impingement mortality. Under 40 C.F.R. § 125.94(c)(7), a facility meets the impingement mortality standard so long as no more than 24 percent of "non-fragile species" are killed. The EPA has explained,

36

though, that it excluded fragile species because its data showed that the mortality of those species depends largely on natural conditions, not technology performance. Including fragile species in the mortality calculation would therefore mask the true effectiveness of the technology and render it impossible to identify a BTA to minimize impingement. The EPA's explanation is adequately supported by the administrative record, and the Environmental Petitioners point to no evidence suggesting that it is irrational.

### B. Environmental Petitioners' APA-Based Challenge

We turn to the Environmental Petitioners' challenge under the APA to the definition of "new unit." The EPA determined that "new units" at existing facilities, like the "new facilities" covered by the Phase I rule, 40 C.F.R. § 125.83 (defining "new facility"), must meet performance standards commensurate with those that may be attained by closed-cycle cooling, id. § 125.94(e)(1)–(2). It defined "new unit" to exclude rebuilt, repowered, and replacement units at existing facilities, such that only "new stand-alone" units added after October 14, 2014 are subject to the more stringent closed-cycle standard. Id. § 125.92(u) (quotation marks omitted); see 79 Fed. Reg. at 48,311. The Environmental Petitioners argue that there is no rational connection between the facts found by

the EPA and its decision to exclude rebuilt, repowered, and replacement units from the definition of "new unit." We disagree.

Responding to comments on the proposed rule, the EPA explained that it excluded rebuilt units for two primary reasons: first, including rebuilt units would discourage manufacturers from improving their facilities; and second, many activities that could be considered "rebuilding" or "repowering" would raise the same hurdles that led the EPA to conclude that closed-cycle cooling was not nationally available. The Rule's preamble reflects the same concerns. See 79 Fed. Reg. at 48,311, 48,339. The EPA thus "articulate[d] a satisfactory explanation for" limiting the definition of "new unit," and there is a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (quotation marks omitted).

The Environmental Petitioners stress that the EPA narrowed the definition of "new unit" that appeared in the proposed rule. But an agency may modify a rule through the notice-and-comment process so long as the agency's modification is rational and "the agency's path may reasonably be discerned." Id. (quotation marks omitted); see also Ne. Md. Waste Disposal Auth. v. EPA, 358 F.3d 936, 951 (D.C. Cir. 2004) ("Agencies[] are free—indeed, they are

encouraged—to modify proposed rules as a result of the comments they receive."). Here, the EPA explained why it ultimately defined "new unit" in the manner it did after the notice-and-comment period, and we discern no "clear error of judgment" in its explanation. See Nat. Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 97 (2d Cir. 2001) (quotation marks omitted). Accordingly, we decline to vacate this portion of the Rule.

### C. Environmental Petitioners' ESA-Based Challenges

The Environmental Petitioners next challenge various elements of the section 7 consultation process—relating to the Services' biological opinion and ITS—as inconsistent with the ESA and the Services' own implementing regulations.

#### i. The Biological Opinion

The Environmental Petitioners argue that the Services' biological opinion violates section 7 of the ESA by (1) deferring analysis of the Rule's impact on jeopardy to later review by individual Directors; (2) failing to use the best scientific and commercial data available to evaluate thermal impacts of the Rule; (3) failing to analyze the Rule's effect on species under the FWS's jurisdiction; and (4) concluding that the Rule is unlikely to jeopardize ESA-listed species or

39

adversely modify their critical habitat. We reject each of these arguments, most of which are really challenges to the Services' "programmatic" approach to the biological opinion.

### a. Jeopardy Analysis

As stated above, section 7 of the ESA requires federal agencies, in consultation with the Services, to "insure that any action authorized, funded, or carried out by" the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify any critical habitat designated for such species. 16 U.S.C. § 1536(a)(2). In evaluating the Rule, the Services determined that a "programmatic," or process-based, approach was appropriate. Bio. Op. 36. Instead of site- and species-specific analyses, this approach involves "examin[ing] whether and to what degree [the] EPA has structured" the Rule to satisfy section 7's mandate. Id. Applying this approach, the Services concluded that the Rule was unlikely to jeopardize listed species because it "built in a sufficient process" to avoid jeopardy (e.g., giving the Services a meaningful opportunity to review permit applications and to recommend control measures and requirements for monitoring and reporting). Id. at 72. As this "technical assistance process" was

critical to the Services' no-jeopardy conclusion, we briefly describe its key features below.

The Rule contemplates that regulated facilities must include in their permit applications information about the presence of ESA-listed species.  40 C.F.R. § 125.95(f).  The Director who reviews the application then sends it to the Services for a sixty-day review period, after which the Director must publish any information or recommendations the Services provide.  Id. § 125.98(h); 79 Fed. Reg. at 48,382.  In those jurisdictions where a Director administers the permitting process, the Services may raise concerns with the EPA, which can then coordinate with the Director to comply with the CWA and the ESA. Alternatively, the EPA may federalize the permit and initiate formal consultation with the Services pursuant to section 7 of the ESA.[13]  See 40 C.F.R. § 123.44; 79 Fed. Reg. at 48,381–83.

The Environmental Petitioners object, first, that "there is no formal assurance that such a process will, in fact, be followed."  Envtl. Br. 98.  Although

---

[13] If the EPA determines, with the benefit of the Services' expertise, that the terms of a permit fail to comply with the CWA or the ESA, the EPA must either coordinate with the Director to achieve such compliance or, failing that, federalize the permit and initiate formal consultation with the Services pursuant to section 7 of the ESA.  See 40 C.F.R. § 123.44; 79 Fed. Reg. at 48,381–83.

41

the Rule explicitly requires Directors to send permit applications and draft permits to the Services, 40 C.F.R. § 125.98(h), the Rule's preamble, they point out, characterizes the Services' role as reflecting the EPA's "expectations," see, e.g., 79 Fed. Reg. at 48,381 ("EPA expects that the Services will respond within 60 days and provide to the Director . . . any measures that the Services recommend . . . for the protection of listed species . . . ." (emphasis added)). True, but the Rule itself is properly interpreted to require the Services' participation in the technical assistance process because that process is part of the proposed action the Services approved pursuant to formal consultation. See Ctr. for Bio. Diversity v. FWS, 807 F.3d 1031, 1046 & n.12 (9th Cir. 2015) (proposed conservation measures in challenged memorandum of agreement were enforceable because they were "included as part of the project consulted upon" (quotation marks omitted)); see also FWS & NMFS, Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act at 4-19 (1998) ("Consultation Handbook") ("Since conservation measures are part of the proposed action, their implementation is

required under the terms of the consultation.").[14] We do not presume that an agency will act in accordance with "expectations" set out in a governing regulation. Rather, we reach the much more limited conclusion that where, as here, the Services conditioned their no-jeopardy finding on compliance with certain procedures and represented to this Court at oral argument that they have a "commitment" to those procedures, Oral Arg. Tr. 33:11, the Rule obligates the Services to abide by those procedures. If the Services fail to honor the obligations specified in the Rule's technical assistance provisions, the Environmental Petitioners may challenge individual permits pursuant to the ESA's citizen-suit provisions once those permits issue. See 16 U.S.C. § 1540(g)(1)(A).

The Environmental Petitioners also contend that even if the technical assistance process is binding, the Services nonetheless contravened the ESA and its implementing regulations by deferring analysis of the Rule's impact on jeopardy to the permit-specific review stage. According to the Environmental Petitioners, the Services improperly disregarded their obligation to "consider all phases" of the agency action in their initial biological opinion, as the Ninth

---

[14] Moreover, formal consultation can be reinitiated if any of "the assumptions about the [technical assistance] process . . . are not being followed." Bio. Op. 78–79.

Circuit appears to require. Envtl. Br. 100 (citing Conner v. Burford, 848 F.2d 1441, 1453–54 (9th Cir. 1988)). But "the rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA," Defs. of Wildlife, 733 F.3d at 1121 (quotation marks omitted), and, like the Eleventh Circuit, we decline to adopt such a rule here.[15] Nothing in the ESA requires that the Services assess every future "phase" of an agency action on a site-specific or species-specific basis. Therefore, properly construing the agency action as the promulgation of CWA section 316(b) standards, the Services discharged their duty to assess "the effects of the action as a whole" in their biological opinion. 50 C.F.R. § 402.14(c).

---

[15] In any event, the Services' biological opinion would satisfy even the Ninth Circuit's purported rule. The "agency action" subject to consultation here was the EPA's promulgation of the Rule, not the subsequent implementation of the Rule by State Directors. See 50 C.F.R. § 402.03 (section 7 consultation requirement applies only to "actions in which there is discretionary Federal involvement or control"); Nat'l Ass'n of Home Builders, 551 U.S. at 650, 653 n.4 ("If [permitting] authority is transferred [from the EPA to a State], then state officials—not the federal EPA—have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight."). To the extent future permits affect ESA-listed species, those effects are not "phases" of the Rule, Envtl. Br. 100, but, as the Services concluded, "indirect effects" of the Rule, 50 C.F.R. §§ 402.02, 402.14(g)(3).

For similar reasons, we reject the Environmental Petitioners' complaint that the technical assistance process "is not the equivalent of" section 7 consultation. Envtl. Br. 106. In those jurisdictions where the State administers the NPDES program, the Services have no obligation to conduct section 7 consultation or its "equivalent" on individual permits because the issuance of such a permit is not a federal action.

## b. Thermal Impacts

The Services similarly deferred consideration of how thermal pollution resulting from the operation of CWISs would affect aquatic ecosystems. They explained in the biological opinion that "[t]o date, [the] EPA has not been able to reliably estimate the impact of thermal discharge associated with CWIS operations on federally-listed species or designated critical habitat." Bio. Op. 51. Instead of relying on available data, the Services thought it enough that the EPA committed to overseeing the technical assistance process, "which will allow [the] EPA to more reliably estimate the . . . stressors that are likely to be produced as a direct or indirect result of thermal discharge activities" at individual facilities. Id. The Environmental Petitioners argue that the Services thus shirked their statutory responsibility to consider the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). They claim that available modeling techniques would have allowed the Services to estimate thermal pollution in the biological opinion rather than defer analysis to the permitting process.

As an initial matter, we disagree with the Environmental Petitioners that the Services failed to "seek out and consider" existing scientific data on thermal pollution. Miccosukee Tribe of Indians v. United States, 566 F.3d 1257, 1265 (11th

45

Cir. 2009); see Bio. Op. App'x C, at 41 (citing a report on thermal stressors the Environmental Petitioners suggest was ignored). Rather, evidently aware of this data and the risk of environmental harm from thermal pollution, the Services nonetheless agreed with the EPA that "[t]he exact nature and magnitude of . . . indirect effects [including thermal pollution] would be species-specific based on the relative size and amount of overlap of habitat with facility and CWIS locations . . . and many other factors." Bio. Op. 42 (quotation marks omitted).

The more central question, then, is not whether the Services considered available data, but whether they were authorized to determine that there was no "best . . . data available" that would enable assessment of thermal pollution on a national scale, 16 U.S.C. § 1536(a)(2), and therefore to defer consideration of thermal impacts to the site-specific permitting process.

We conclude that they were so authorized. We find support for our conclusion in the Eleventh Circuit's 2013 decision in Defenders of Wildlife, 733 F.3d 1106. Petitioners there challenged a biological opinion issued by the NMFS that approved the installation of an "Undersea Warfare Training Range" and allegedly deferred any consideration of the effects of operations expected to occur on that range until those operations were actually authorized. Id. at 1113–

46

14, 1118. The Eleventh Circuit concluded both that the NMFS adequately considered the effects of future operations in its initial biological opinion and that the NMFS was authorized to reconsider those effects in a new biological opinion "closer in time to when [the] operations will actually commence." Id. at 1122.

We agree with the Eleventh Circuit that, as long as the initial stage of an agency's project "does not foreclose the adoption of . . . reasonable and prudent measures [to avoid jeopardy], and as long as the conclusions of the biological opinion are not arbitrary, a staged structuring of consultation may comply fully with Section 7's mandate." Id. Far from being arbitrary, the Services' conclusion here that a categorical assessment of thermal impacts was infeasible reflects a "scientific determination deserving deference," Miccosukee Tribe, 566 F.3d at 1265, and nothing else compels us to order that consultation be carried out in some other manner, see Defs. of Wildlife, 733 F.3d at 1121–22. We therefore hold that the Services did not violate their statutory obligations when they decided to solicit more data (during the permitting process) in order to assess thermal impacts on a site-specific basis.

## c. Species Within the FWS's Jurisdiction

The Environmental Petitioners next argue that the FWS failed adequately to analyze the Rule's effect on species within its jurisdiction before making a no-jeopardy determination. Unlike the NMFS, which provided detailed appendices containing information on species under its jurisdiction, the FWS provided one section in the biological opinion that, according to the Environmental Petitioners, is "cursory to the point of meaninglessness" and fails to satisfy the FWS's duty under 16 U.S.C. § 1536(b)(3)(A) to "detail[] how the agency action affects . . . species or [their] critical habitat." Envtl. Br. 131–32. As the Environmental Petitioners acknowledge, however, a biological opinion need only include the following elements: "the current status of the species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the proposed action." Gifford Pinchot Task Force v. FWS, 378 F.3d 1059, 1063 (9th Cir. 2004) (citing 50 C.F.R. § 402.14(g)(2)–(3)), superseded on other grounds by Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 (Feb. 11, 2016) (codified at 50 C.F.R. § 402.02). Here, the FWS provided the current status of the species and the environmental baseline but, relying on the protections of the technical assistance process, deferred evaluation of the

48

Rule's effects on the species within its jurisdiction. At bottom, then, the Environmental Petitioners' argument is yet another challenge to the Services' programmatic approach, and we reject it for the same reasons stated above with respect to the Services' analysis of thermal impacts.

### d. No-Jeopardy Conclusion

Having resolved the Environmental Petitioners' various challenges to the Services' programmatic approach, we now turn to their attack on the Services' substantive conclusion that the Rule, including the protections of the technical assistance process, is "not likely to jeopardize the continued existence of ESA-listed species" or destroy or adversely modify their critical habitat. Bio. Op. 71. The Environmental Petitioners argue that the administrative record does not support the Services' conclusion because the Services failed to consider four factors: the current jeopardy of numerous listed species, the impact on listed species during the Rule's indefinite implementation period, the Rule's impact on species recovery (as opposed to species survival), and the discretionary nature of the technical assistance process. We address each of these factors in turn.

First, the Environmental Petitioners fault the Services for reaching a no-jeopardy conclusion after they identified several species that are currently or

49

nearly in jeopardy. They argue that the Services may not sanction agency action that causes any additional harm and thus "deepens" jeopardy. Envtl. Br. 110 (quoting Nat'l Wildlife Fed'n v. NMFS, 524 F.3d 917, 930 (9th Cir. 2008)). But the Services made no formal finding that any species are, as the Environmental Petitioners contend, "currently in jeopardy or nearly so." Envtl. Br. 110. The NMFS found only that continued operation of CWISs under the Rule would have adverse impacts on species that are threatened or whose status is "precarious." See, e.g., Bio. Op. App'x B, at 15; Bio. Op. App'x C, at 53. Were this finding enough to foreclose a no-jeopardy conclusion, even the Environmental Petitioners' preferred solution of mandating closed-cycle cooling—which, after all, would not eliminate impingement and entrainment of threatened species by CWISs—would fail ESA consultation.

Second, the Environmental Petitioners claim that the biological opinion "ignores the harm that will occur during the significant time lag . . . between the effective date of the Rule and implementation of any protective measures for listed species at specific facilities." Envtl. Br. 115. This argument rests on a misunderstanding of the actions subject to section 7 consultation. Section 7 tasks the Services with analyzing the effects of the EPA's proposed action. "Take"

50

resulting from CWIS operations at facilities operating under permits issued prior to the Rule, see 16 U.S.C. § 1538(a)(1)(B), (G), and which the EPA has no authority to modify, is not an "effect" of the Rule and is therefore not subject to analysis by the Services.[16]  To the extent the Environmental Petitioners object to the "significant lag time in the Rule's implementation," Envtl. Reply Br. 82, that lag time, without more, is not arbitrary or capricious, especially where, as here, the EPA reasonably explained why it may take three to fourteen years to fully implement the Rule, see 79 Fed. Reg. at 48,358–60.

Third, the Environmental Petitioners argue that the Services failed to consider whether the Rule would hinder the recovery of listed species.  As part of their jeopardy analysis, the Services were required to consider the Rule's impact on species recovery, in addition to species survival.  See Nat'l Wildlife Fed'n, 524 F.3d at 932.  But an independent analysis of recovery is not required, see Rock Creek All. v. FWS, 663 F.3d 439, 443 (9th Cir. 2011), in part because it is hard to "draw clear-cut distinctions" between survival and recovery, 51 Fed.

---

[16] The Rule makes clear that it does not independently authorize take.  40 C.F.R. §§ 125.90, 125.94(c)(11), 125.98(b)(1), 125.98(j); see 79 Fed. Reg. at 48,382.  If a facility engages in unlawful take before the Rule is fully implemented, the Environmental Petitioners may file an action against that facility to enjoin the take.  See 16 U.S.C. § 1540(g).

51

Reg. 19,926, 19,934 (June 3, 1986). Nevertheless, the Services here recognized the need to "assess[] whether the action would appreciably reduce the likelihood of recovery of listed species," Bio. Op. 17, and concluded that the Rule "has built in a sufficient [technical assistance] process to insure that it is not likely to result in an appreciable reduction in the likelihood of both the survival and recovery of any listed species," id. at 72 (emphasis added). The Services therefore did not "avoid . . . consideration of recovery impacts," Nat'l Wildlife Fed'n, 524 F.3d at 932, but rather concluded that such impacts, like survival impacts, should be assessed on a site-specific basis—an approach that complies with the ESA.

Finally, the Environmental Petitioners maintain that even if the Services can rely on a rule's process-based protections rather than analyze its substantive impacts, this Rule's technical assistance process cannot support a no-jeopardy finding because it is "wholly voluntary" and "not designed to provide meaningful species protection," as it fails to promote the use of closed-cycle cooling. Envtl. Br. 120–21. We reject this argument because, as explained, the technical assistance process involves a binding commitment by the Services, and the EPA acted reasonably in declining to mandate standards based on closed-cycle cooling.

## ii. The Incidental Take Statement

In their final challenge, the Environmental Petitioners contend that the Services failed to comply with the provisions of the ESA that specify requirements for ITSs. If a consulting Service concludes after formal consultation that the incidental take of listed species will not cause jeopardy, that Service "shall" provide the acting agency with an ITS that:

> (i) specifies the impact of such incidental taking on the species,
> (ii) specifies those reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact,
> (iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of [the Marine Mammal Protection Act] with regard to such taking, and
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency . . . to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4). The Environmental Petitioners assert that the ITS issued by the Services here is deficient in all four respects.

The Services' ITS fails to specify the impact of the take, the Environmental Petitioners argue, because it does not numerically quantify the Rule's anticipated take. It is true that Congress preferred expressing take in numerical form, so as to establish a "trigger" for the re-initiation of consultation. See Endangered

53

Species Act, H.R. Rep. No. 97-567, at 27 (1982); Ariz. Cattle Growers' Ass'n v. FWS, 273 F.3d 1229, 1249 (9th Cir. 2001). But Congress also acknowledged that a "precise number" is not always available. H.R. Rep. No. 97-567, at 27; see Ariz. Cattle Growers' Ass'n, 273 F.3d at 1249 ("We have never held that a numerical limit is required."). Therefore, although an ITS that "contains no numerical cap . . . normally violates the ESA," such an ITS is adequate if it "explain[s] why it was impracticable to express a numerical measure of take." Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1126–27 (9th Cir. 2012) (quotation marks omitted); see also Miccosukee Tribe, 566 F.3d at 1275. The ITS here explains that the "paucity of information" about facilities with CWISs prevented the Services from quantifying anticipated take at this juncture, and it contemplates that the Services' field offices will quantify incidental take at individual facilities as part of the technical assistance process. Bio. Op. 75–76. Given the Services' commitment to the technical assistance process, their justification for not immediately quantifying take is adequate.

The Environmental Petitioners next assert that the Services' ITS failed to specify "reasonable and prudent measures" to minimize the impact of incidental take on listed species, in contravention of 16 U.S.C. § 1536(b)(4)(ii), or to set forth

54

terms and conditions required to implement those measures, in contravention of

16 U.S.C. § 1536(b)(4)(iv) and 50 C.F.R. § 402.14(i)(1)(iv).  But the ITS does

identify one reasonable and prudent measure, namely, that the "EPA will use its

authorities under the CWA to minimize impacts to listed species pursuant to the

[section] 316(b) Rule and [the] CWA."  Bio. Op. 76.  The ITS also includes various

administrative conditions, like a detailed annual reporting requirement, and

several substantive implementing conditions.  It specifies, for example, that the

EPA will ask Directors to reopen continued permits if the Services determine that

a facility's CWIS operations may have more than minor detrimental effects on

listed species.  These elements of the ITS are adequate.  The ESA does not

mandate any particular form or content for reasonable and prudent measures,

requiring only that the Services identify measures that they "consider[] necessary

or appropriate" to minimize the impact of incidental take.[17]  16 U.S.C.

§ 1536(b)(4)(ii).  And contrary to the Environmental Petitioners' assertion, the

Services have not "delegate[d]" the task of determining reasonable and prudent

measures to the EPA.  Envtl. Br. 124.  Rather, the Services specified as a

_____

[17] The ESA's implementing regulations, far from demanding an extensive list of
reasonable and prudent measures or terms and conditions, specify only that these
elements of the ITS "cannot alter the basic design, location, scope, duration, or timing of
the [agency] action and may involve only minor changes."  50 C.F.R. § 402.14(i)(2).

reasonable and prudent measure that the EPA must exercise its oversight authority under the CWA in connection with the Rule's technical assistance process. Their reliance on the binding technical assistance process was a "meaningful . . . attempt to minimize incidental takings associated with the project." Or. Nat. Res. Council v. Allen, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007).

Finally, the Environmental Petitioners assert that the ITS fails to include measures necessary to comply with the Marine Mammal Protection Act ("MMPA") and that the NMFS unlawfully failed to prescribe regulations under section 1371(a)(5) of the MMPA that set forth permissible methods of taking marine mammals due to the operation of CWISs.[18] We are not persuaded, especially because the biological opinion contemplates that facilities whose CWISs may affect certain marine mammals or their critical habitat will be required to "[i]nstall large organism excluder devices" and contact the NMFS "to

---

[18] Section 1371(a)(5)(A)(i) provides that the NMFS may authorize the incidental taking of small numbers of marine mammals if it:

> (I) finds that the total of such taking . . . will have a negligible impact on such species or stock . . . ; and (II) prescribes regulations setting forth—(aa) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat . . . ; and (bb) requirements pertaining to the monitoring and reporting of such taking.

16 U.S.C. § 1371(a)(5)(A)(i).

determine whether [they] need to apply for a[n] [MMPA] permit." Bio. Op. App'x D, at 1. The biological opinion thus outlines a procedure under which either no marine mammals are taken or, if necessary, the NMFS will authorize take pursuant to the MMPA in the context of individual permit applications.

For these reasons, we reject the Environmental Petitioners' challenges to the ITS under the ESA.

### 4. The Industry Petitioners

We now turn to the three petitions for review filed by the Industry Petitioners—UWAG, API, and the CWIS Coalition.

#### A. UWAG

UWAG challenges on procedural and substantive grounds what it describes as the "Service-driven" provisions of the Rule (including provisions relating to the technical assistance process) that the EPA added after formal consultation to minimize harm to listed species resulting from the operation of CWISs.

##### i. Procedural Challenges

UWAG contends that the EPA violated the APA by failing to provide adequate notice of and an opportunity to comment on the Rule's Service-driven

provisions, the EPA's biological evaluation, the Services' biological opinion, and the underlying data that supported each. See 5 U.S.C. § 553(b), (c). But there is no "independent right to public comment with regard to consultations conducted under § 7(a)(2)" of the ESA. Nat'l Ass'n of Home Builders, 551 U.S. at 660 n.6. So no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services. See id. ("Nothing in section 7 authorizes or requires the Service[s] to provide for public involvement (other than that of the applicant) in the 'interagency' consultation process." (quoting 51 Fed. Reg. at 19,928)). Unless the scientific material discussed in the biological opinion ultimately formed the "basis" of the EPA's rule, the public was not entitled to comment on it. See United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 252 (2d Cir. 1977).

As for the Rule itself, the EPA was required only to "fairly apprise interested persons of the subjects and issues of [its] rulemaking." Nat'l Black Media Coal., 791 F.2d at 1022 (quotation marks omitted). "The final rule need only be a logical outgrowth of the proposed rule, not an exact replica of it." Riverkeeper I, 358 F.3d at 202 (quotation marks omitted); see also Riverkeeper II, 475 F.3d at 116 ("An agency cannot pull a surprise switcheroo on interested

58

parties between a proposal and the issuance of a final rule." (quotation marks omitted)); Ne. Md. Waste Disposal, 358 F.3d at 951–52. Here, the proposed rule addressed potential impacts on listed species. It would have required Directors to identify the benefits of available technologies to threatened and endangered species, 76 Fed. Reg. at 22,288, and NPDES permit applicants to submit information on all threatened and endangered species susceptible to impingement and entrainment at their CWISs, id. at 22,276. The proposed rule also contemplated input from the Services by allowing Directors to confer with both the EPA and the Services when issuing permit applications. See id. at 22,205, 22,210, 22,278. Because these provisions "fairly apprise[d] interested persons" that the "subjects and issues of the rulemaking" included compliance with the ESA and also fairly apprised them of the Services' role in achieving that compliance, Nat'l Black Media Coal., 791 F.2d at 1022 (quotation marks omitted), we reject UWAG's APA-based challenge to the Service-driven provisions.

59

## ii. Substantive Challenges

### a. The Service-Driven Requirements

UWAG broadly contends that the Service-driven requirements of the Final Rule are neither authorized by nor consistent with section 316(b) of the CWA.[19] It goes so far as to say that the EPA had no authority to create a role for the Services, even in advising the EPA and Directors on site-specific environmental impacts. Although that broad claim has no basis in the statutory language or, for that matter, our caselaw, see Fund for Animals v. Kempthorne, 538 F.3d 124, 133

---

[19] As stated above, section 316(b) mandates that any standard established pursuant to section 301 or 306 "shall" require that the "location, design, construction, and capacity" of CWISs "reflect the best technology available for minimizing adverse environmental impact." 33 U.S.C. § 1326(b). Relying on Riverkeeper I, UWAG argues that an agency acting pursuant to section 316(b) may require measures related only to the "location, design, construction, [or] capacity" of CWISs, but 40 C.F.R. § 125.98(b)(2) allows Directors to require facilities to implement "additional control measures" unrelated to these four parameters. This provision, though, is more limited than the "restoration" provisions we remanded in Riverkeeper I. See 358 F.3d at 189–91. If a Director at a given site includes in a permit control measures that "have nothing to do with" section 316(b)'s parameters, id. at 189, the EPA may still veto the permit, see 40 C.F.R. § 123.44(c). If the EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge. We therefore agree with the EPA that UWAG's challenge is unripe. See EPA v. EME Homer City Generation, L.P., 134 S. Ct. 1584, 1609 (2014); Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 732–33 (1998) (ripeness requirement is intended to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties" (quotation marks omitted)).

(2d Cir. 2008), we address UWAG's more pointed assertion that the EPA unlawfully delegated its authority to the Services.

An agency impermissibly delegates its authority where, without statutory authorization, "it shifts to another party almost the entire determination of whether a specific statutory requirement . . . has been satisfied, or where [it] abdicates its final reviewing authority." Id. at 133 (quotation marks omitted). "Agencies may seek advice and policy recommendations from outside parties, but they may not rubber-stamp decisions made by others under the guise of seeking their advice." Id. (quotation marks omitted). Because section 402 of the CWA, which authorizes the EPA to delegate responsibility for administering the NPDES program to the States (with the EPA retaining veto authority), does not authorize delegation to the Services, UWAG objects to the provisions of the Rule "requir[ing] States to coordinate or consult with the Services" and giving the Services "a special opportunity to provide 'technical assistance.'" UWAG Br. 38. It also objects to an interpretation of the Rule that allows the EPA to veto a draft permit "based on recommendations or determinations made by the Services." UWAG Br. 39. These objections lack merit for two reasons.

First, the Rule does not require Directors to accept the Services' recommendations and clearly vests the authority to establish permit requirements in Directors, not the Services.[20] See 40 C.F.R. § 125.94(g) ("[C]ontrol measures, monitoring requirements, and reporting requirements [established by the Director] may include measures or requirements identified by [the Services]." (emphasis added)); see also id. §§ 125.96(g), 125.98(b), 125.98(f). Second, the EPA has hardly "abdicate[d] its final reviewing authority" by providing for the Services' input. Fund for Animals, 538 F.3d at 133 (quotation marks omitted); see U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 568 (D.C. Cir. 2004). To the contrary, nothing in the Rule itself suggests that the EPA will "rubber-stamp" the Services' conclusions. See 79 Fed. Reg. at 48,382–83 (EPA has "discretionary" oversight authority). Rather, the Rule contemplates that the EPA will independently determine, with the benefit of the Services' expertise, whether the terms of a permit comply with section 316(b) of the CWA. Such a scheme reflects the cooperative arrangement specified by Congress in the ESA and by the agencies in their MOA, not unlawful delegation.

---

[20] UWAG's delegation challenge is therefore weaker than the one we rejected in Fund for Animals, where the FWS issued an order under the Migratory Bird Treaty Act that transferred final permitting authority to other agencies. 538 F.3d at 130, 132–33.

## b. The Biological Opinion

UWAG also challenges the Services' biological opinion. Again, we are not persuaded.

UWAG asserts that the biological opinion is unlawful because the Services should have concurred in the EPA's initial determination that the proposed rule was unlikely to adversely affect listed species. This is especially true, UWAG claims, where the EPA, in its biological evaluation, initially defined its action as one that merely sets standards rather than authorizes any new activities. Under these circumstances, UWAG asserts, the Services could not conduct formal consultation.

We conclude that the agencies acted appropriately in conducting formal consultation. The ESA requires the Services to independently evaluate the effects of agency action on a species or critical habitat. See 16 U.S.C. § 1536(b)(3)(A); Conservation Cong. v. U.S. Forest Serv., 720 F.3d 1048, 1051 (9th Cir. 2013). The Services' Consultation Handbook explains that the Services will find that an agency action is "not likely to adversely affect" a species or habitat "only if ALL of the reasonably expected effects of the proposed action will be beneficial, insignificant, or discountable." Consultation Handbook at 4-1. In

63

this case, the Services' finding that this standard was not satisfied was reasonable because the EPA acknowledged that listed species would continue to be affected after implementation of the proposed rule and because the nature of the proposed rule's impact on listed species remained unclear. See id. at 3-13 ("[I]f there is not enough information to adequately determine the nature of the effects, a letter of nonconcurrence is provided to the action agency.").

Nor do we agree that the Services, having proceeded with formal consultation, should have issued a no-jeopardy finding without including the Service-driven provisions just because the proposed rule would have produced a net reduction in species mortality even absent those provisions. The ESA's implementing regulations provide a structure for issuing jeopardy findings. To determine whether a proposed action is "likely to jeopardize" listed species or adversely modify critical habitat, 50 C.F.R. § 402.14(g)(4), the Services are required to evaluate the "[e]ffects of the action," meaning "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline," id. § 402.02. The "environmental baseline" includes, as relevant here, "the past and present

impacts of all Federal, State, or private actions and other human activities in the action area." Id. § 402.02; see also Consultation Handbook at 4-22 ("The environmental baseline is a 'snapshot' of a species' health at a specified point in time. It does not include the effects of the action under review in the consultation."). "Indirect effects," which are not included in the baseline, "are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. Where the future operation of a regulated facility depends on the discretion of the acting agency, the continued operation of that facility is not a "past" or "present" impact of previous federal action. See Nat'l Wildlife Fed'n, 524 F.3d at 930–31; In re Operation of the Mo. River Sys. Litig., 421 F.3d 618, 632–33 (8th Cir. 2005).

The Services here concluded that because "the operation of [CWISs] is within [the] EPA's discretion" under section 316(b)—i.e., the discretion to set BTA standards that affect how CWISs operate and whether they will jeopardize listed species—the continued operation of CWISs under the Rule is not "a past impact of Federal action" (such that it would be included in the environmental baseline), but rather an indirect effect of the Rule. Bio. Op. 28. We defer to the Services' reasonable interpretation that the effects of future CWIS operations on

listed species are properly considered indirect effects of the Rule.  See Forest Watch v. U.S. Forest Serv., 410 F.3d 115, 117–18 (2d Cir. 2005).  And the Services were not cornered into making a no-jeopardy finding just because the proposed rule was expected to reduce entrainment and impingement mortality.  Consistent with the ESA's goal of "conserv[ing] endangered species and threatened species," 16 U.S.C. § 1531(c)(1), the relevant inquiry is whether the action causes jeopardy or adverse modification, period—not whether it provides "incremental improvements" that make conditions "slightly less harmful" to a species but still reduce the likelihood of survival and recovery for that species, Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin., 175 F.3d 1156, 1162 n.6 (9th Cir. 1999).

### B.  American Petroleum Institute

As we explained above, the Final Rule requires that "new units" at existing power plants and manufacturing facilities be designed to withdraw an amount of water commensurate with that withdrawn by a closed-cycle cooling system or otherwise provide the same protection from adverse environmental impacts.  40 C.F.R. § 125.94(e).  Focusing on how the Rule applies to manufacturing facilities, API argues that the proposed rule did not provide adequate notice of the

meaning of "new unit" and that the EPA's estimate of compliance costs for manufacturing facilities that install "new units" improperly relied on limited and outdated data. We reject both arguments.

i. Notice of "New Unit" Definition

As already noted, the Final Rule need only be a "logical outgrowth" of the proposed rule. Riverkeeper II, 475 F.3d at 113 (quotation marks omitted). In its proposed rule, the EPA defined "new unit" (which the preamble likened to "new stand-alone facilities") as "any addition of an operating unit at an existing facility" after the Rule's effective date, including "newly built units added to increase capacity at the facility." 76 Fed. Reg. at 22,196, 22,282. During the comment period, API commented on this proposed definition, arguing that it was unclear and that, insofar as it referred to "increase[d] capacity," it applied only to power plants, not manufacturing facilities. In the Final Rule, the EPA removed the "increase[d] capacity" language and defined "new unit" as a new "stand-alone" unit. See 40 C.F.R. § 125.92(u); see also 79 Fed. Reg. at 48,311, 48,353. API thus had, and took advantage of, the opportunity to comment on the definition of "new unit," and also had "fair notice" of the change the EPA eventually adopted in response. Long Island Care at Home, Ltd. v. Coke, 551

67

U.S. 158, 174–75 (2007).  The EPA therefore complied with the APA's notice-and-comment requirements in defining "new unit."

ii. Estimate of Compliance Costs

We turn, then, to the EPA's estimate of compliance costs.  To analyze compliance costs, the EPA collected data from site visits (including visits to eight manufacturing facilities), reviewed industry comments, and considered industry-specific studies involving manufacturing facilities.  The EPA acknowledges that it collected more extensive data from power plants than from manufacturing facilities.  But in urging that the data on manufacturing facilities is unduly limited, API fails to explain why data on intake structures used at power plants would not apply equally to those used at manufacturing facilities.  Nor is the EPA's greater focus on power plants arbitrary and capricious, as manufacturing facilities have more options to reuse cooling water and therefore will, on average, incur lower compliance costs than power plants.

We also reject API's assertion that the EPA relied excessively on "outdated" data.  Although the EPA relied in part on surveys conducted during the Phase II rulemaking in the early 2000s, see 67 Fed. Reg. 17,122, 17,134 (Apr. 9, 2002), the EPA sought to improve accuracy by collecting additional information

68

and adjusting costs for inflation. Based on this information, the EPA determined that most manufacturing facilities would comply with the Rule's "new unit" standards by reusing cooling water for manufacturing processes (now reported to be an industry standard practice). The EPA thus "examine[d] the relevant data" and articulated "a rational connection" between that data and its conclusion that manufacturing facilities would not incur meaningful additional costs in implementing the Rule's requirements for new units. State Farm, 463 U.S. at 43 (quotation marks omitted); see also Forest Watch, 410 F.3d at 118–19.

### C. CWIS Coalition

The CWIS Coalition brings two additional challenges to the Final Rule, both of which rest on misinterpretations of the Rule.

#### i. Permit Application Requirements for "Below-Threshold" Facilities

The parties agree that the Final Rule, at least as described in its preamble, sets standards only for facilities that withdraw more than 2 mgd and use 25 percent or more of that water exclusively for cooling purposes. 79 Fed. Reg. at 48,304–05, 48,361. But the Coalition argues that the Rule's permit application requirements at 40 C.F.R. § 122.21(r)(1)(ii)(A) apply more broadly to "[a]ll existing facilities" as defined at 40 C.F.R. § 125.92(k), which does not contain any

69

thresholds. Therefore, the Coalition asserts, the Rule arbitrarily subjects even "below-threshold" facilities to burdensome permit application requirements.

The Coalition reads the permit application requirements out of context. The Rule's permit application requirements "apply to [CWISs] at existing facilities that are subject to this subpart," which incorporates the 2 mgd and 25 percent thresholds. 40 C.F.R. § 125.90(a). Although section 122.21(r)(1)(ii)(A) might appear to apply to below-threshold facilities, other subparts of section 122.21(r) confirm that it does not. Section 122.21(r)(1)(ii)(E), for example, states that if a new unit at an existing facility increases the capacity of that facility to more than 2 mgd, then that facility must submit permit application information even if it was "not previously subject to" the Rule's requirements. This provision would be incongruous if below-threshold facilities were already required to meet the permit application requirements. And even if the Rule were ambiguous with respect to the applicability of its permit application requirements, the Coalition has not shown that the EPA's interpretation of its own regulations in this case is "plainly erroneous or inconsistent with the regulation." Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 208 (2011) (quotation marks omitted). We therefore defer to that interpretation and decline to vacate 40 C.F.R. § 122.21(r)(1)(ii)(A).

## ii. BTA Requirements for Individual Structures

The Coalition also contends that the EPA exceeded its authority under section 316(b) by imposing BTA requirements on individual intake structures that withdraw no water for cooling purposes. But the Rule defines a "cooling water intake structure" as the "total physical structure and any associated constructed waterways used to withdraw cooling water from waters of the United States." 40 C.F.R. § 125.92(f) (emphasis added). If a structure withdraws water only for process purposes, it is not a "cooling water intake structure" and therefore not subject to the Rule's requirements. To the extent the Coalition argues that the EPA may not regulate CWISs that use only a "small portion of the water withdrawn" for cooling purposes, Coal. Br. 19, this argument lacks any basis in the CWA. Section 316(b) directs the EPA to promulgate regulatory standards for "cooling water intake structures" without defining the term or setting any particular threshold for water withdrawal. 33 U.S.C. § 1326(b). Again, we defer to the EPA's reasonable determination that an intake structure that withdraws some amount of cooling water is a "cooling water intake structure." See Chevron, 467 U.S. at 843; see also Riverkeeper I, 358 F.3d at 203.

**CONCLUSION**

To summarize, we hold that: (1) the EPA acted reasonably and within its statutory authority in establishing BTA standards to minimize aquatic mortality resulting from both entrainment and impingement; (2) the EPA adequately explained why it defined "new units" at existing facilities as new stand-alone structures; (3) the Services' biological opinion is consistent with the ESA and its implementing regulations, and their no-jeopardy finding is supported by the administrative record; (4) the Services' ITS is consistent with the ESA; (5) the EPA provided adequate notice of the Rule's "Service-driven" provisions; (6) the EPA acted within, and did not unlawfully delegate, its statutory authority by including provisions in the Rule that allow the Services to advise the EPA and Directors on the site-specific impacts of CWISs; (7) the EPA and the Services did not violate the ESA by engaging in formal consultation on the proposed rule; (8) the Services were not compelled to find that the proposed rule (without the technical assistance process) would avoid jeopardy just because the proposed rule was expected to reduce impingement and entrainment; (9) the Services complied with their own implementing regulations by treating the continued operation of CWISs as an "indirect effect" of the Rule rather than as part of the

72

environmental baseline; (10) the EPA provided adequate notice of the Rule's definition of "new unit"; (11) the EPA reasonably estimated the cost of complying with the Rule's standards for "new units"; (12) the EPA reasonably interpreted the Rule as not imposing new permit application requirements on "below-threshold" facilities (namely, those that do not withdraw more than 2 mgd and use 25 percent or more of that water exclusively for cooling purposes); and (13) the EPA reasonably determined that section 316(b) of the CWA authorizes it to regulate all CWISs, including those that use only a small portion of the water withdrawn for cooling purposes.

We have considered the Petitioners' remaining arguments and conclude that they are without merit. For the foregoing reasons, we **DENY** the petitions for review.

**APPENDIX**

<u>Glossary of Abbreviations</u>

APA Administrative Procedure Act

API American Petroleum Institute

BTA Best Technology Available

CWA Clean Water Act

CWIS Cooling Water Intake Structure

EPA Environmental Protection Agency

ESA Endangered Species Act

FWS Fish and Wildlife Service

ITS Incidental Take Statement

MMPA Marine Mammal Protection Act

MOA Memorandum of Agreement

NMFS National Marine Fisheries Service

NPDES National Pollutant Discharge Elimination System

UWAG Utility Water Act Group